## In re COX COMMUNICATIONS, INC. SHAREHOLDERS LITIGATION.

### CONS. C.A. No. 613–N.

Court of Chancery of Delaware, New Castle County.

Submitted: May 9, 2005.
Decided: June 6, 2005.

Joseph A. Rosenthal, Esquire, Rosenthal Monhait Gross & Goddess, P.A., Wilmington, Delaware; Plaintiffs' Liaison Counsel.

Arthur N. Abbey, Esquire, Stephen T. Rodd, Esquire, Karin E. Fisch, Esquire, and James S. Notis, Esquire, Abbey Gardy, LLP, New York, New York; U. Seth Ottensoser, Esquire, Bernstein Liebhard & Lifshitz, LLP, New York, New York; Seth D. Rigrodsky, Esquire, and Joseph N. Gielata, Esquire, Milberg Weiss Bershad & Shulman, LLP, Wilmington, Delaware; Michael Hanrahan, Esquire and Gary F. Traynor, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Marc A. Topaz, Esquire, Schiffrin & Barroway, LLP, Radnor, Pennsylvania, Plaintiffs' Executive Committee.

Kevin G. Abrams, Esquire, and Philippe Y. Blanchard, Esquire, Richards, Layton & Finger, Wilmington, Delaware; Michael D. Hays, Esquire, Dow, Lohnes & Albertson, PLLC, Washington, D.C., Attorneys for Cox Enterprises, Inc., Cox Holdings, Inc., Barbara Cox Anthony, Anne Cox Chambers, James C. Kennedy, G. Dennis Berry and Robert C. O'Leary.

William M. Lafferty, Esquire, Morris Nichols Arsht & Tunnell, Wilmington, Delaware; Attorneys for Cox Communications, Inc., James O. Robbins, Janet M. Clarke, Rodney W. Schrock and Andrew J. Young; Alex Sussman, Esquire, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, Attorneys for Janet M. Clarke, Rodney W. Schrock and Andrew J. Young.

Stephen E. Jenkins, Esquire, Ashby & Geddes, Wilmington, Delaware; Elliott J. Weiss, Charles E. Ares Professor, James E. Rogers College of Law, Tucson, Arizona, Attorneys for Objectors Jeffrey Zoub and Franklin Mutual Advisor, LLC.

OPINION

STRINE, Vice Chancellor.

## I. *Introduction*

This decision addresses an objection to a request for attorneys' fees. The plaintiffs seeking the fee award filed premature, hastily-drafted, makeweight complaints attacking a fully negotiable proposal by the Cox family [1] to enter into a merger whereby they would buy all the public's shares in Cox Communications, Inc. The Family's proposal was specifically conditioned on agreement to final merger terms with a special committee of independent directors. Its $32 per share bid constituted a 14% premium over the pre-existing average market price for Cox shares for the 30 calendar days before the announcement.

After vigorous negotiations, the Family and the special committee reached tentative agreement on a merger at $34.75 per share that would be subject to approval by a majority of the minority stockholders. The tentative agreement was conditioned on settlement of the outstanding lawsuits, receipt of a final fairness opinion, and agreement on the terms of a final merger agreement. After the tentative agreement with the special committee, the family's litigation counsel gave the plaintiffs the $34.75 per share and minority approval condition as a "best and absolutely final offer." The plaintiffs settled with the Family agreeing that the pendency of the litigation had contributed to their decision to increase their bid to the final price it reached.

In this opinion, I address the dueling arguments about whether the plaintiffs' requested fee of $4.95 million should be

awarded and describe the legal landscape from which those arguments grow. Rather than attempt to recite that back and forth in summary form here, I instead will summarize my conclusions.

Initially, I conclude that complaints challenging fully negotiable, all cash, all shares merger proposals by controlling stockholders are not meritorious when filed under the *Chrysler Corp. v. Dann*[2] standard. For reasons I explain, this does not prevent the court from approving a class action settlement and a reasonable award of attorneys' fees in a case when the party bearing the fee agrees to pay it and there is no plausible injury to the class from a fee award, but it should, and does here, influence the size of the fees awarded.

Relatedly, I consider the non-coincidental relationship between the premature filing of cases like this and the standard of review articulated in *Kahn v. Lynch Communication Systems, Inc.*[3] Because that standard (as heretofore understood by practitioners and courts) makes it impossible for a controlling stockholder ever to structure a transaction in a manner that will enable it to obtain dismissal of a complaint challenging the transaction, each *Lynch* case has settlement value, not necessarily because of its merits but because it cannot be dismissed.

For that reason, plaintiffs and defendants both have an incentive to settle non-meritorious, premature suits attacking negotiable, going-private proposals. For their part, plaintiffs' lawyers can get sizable fees by "contributing" to the successful work of a special committee and by set-

1. The Cox family owns a controlling stake of Cox Communications, Inc. ("Cox") primarily through a family-owned holding company, Cox Enterprises, Inc. (hereinafter, members of the Cox family and their holding company itself are collectively defined as the "Family").

2. 223 A.2d 384 (Del.1966).

3. 638 A.2d 1110 (Del.1994).

tling at the same level that the special committee achieved. Meanwhile, defendants can avoid the otherwise unavoidable costs of discovery and lost executive time involved in getting rid of any later ripe challenge under *Lynch* to the financial fairness of the final deal negotiated with a special committee. So neatly has this incentive system worked that the plaintiffs cannot cite one example of a *Lynch* case in which plaintiffs sued attacking a negotiable proposal, and refused to settle on the same (or worse) terms than the special committee extracted from the controller.

For reasons I detail, I therefore award a substantially smaller fee than the plaintiffs have requested. I perceive the plaintiffs to have taken no appreciable risk, because they knew the Family would have to materially increase its bid to satisfy the special committee. Moreover, I cannot give credence to the notion that the litigation had a substantially important impact on the pricing of the transaction because the plaintiffs' claims were not meritorious when filed and it is most probable that the defendants settled simply because they had, under *Lynch,* no other economically efficient option for disposal of the lawsuit.

More generally, I conclude that no risk premium should be awarded in fee applications in cases of this kind, when a plaintiff suing on a proposal settles at the same level as the special committee. Even further, if a controller and a special committee ignore a prematurely filed suit and conclude final merger terms, there should be no presumed entitlement to a fee by the plaintiffs, if the plaintiffs attempt to argue that their unripe claims are now moot and that the pendency of those claims influenced the controller to offer the special committee fair terms.

On a more fundamental level, I observe that Delaware law would improve the protections it offers to minority stockholders and the integrity of the representative litigation process by reforming and extending *Lynch* in modest but important ways. The reform would be to invoke the business judgment rule standard of review when a going private merger with a controlling stockholder was effected using a process that mirrored *both* elements of an arms-length merger: 1) approval by disinterested directors; and 2) approval by disinterested stockholders. The two elements are complementary and not substitutes. The first element is important because the directors have the capability to act as effective and active bargaining agents, which disaggregated stockholders do not. But, because bargaining agents are not always effective or faithful, the second element is critical, because it gives the minority stockholders the opportunity to reject their agents' work. Therefore, when a merger with a controlling stockholder was: 1) negotiated and approved by a special committee of independent directors; and 2) conditioned on an affirmative vote of a majority of the minority stockholders, the business judgment standard of review should presumptively apply, and any plaintiff ought to have to plead particularized facts that, if true, support an inference that, despite the facially fair process, the merger was tainted because of fiduciary wrongdoing. This reform to *Lynch* would not permit a controller to obtain business judgment rule protection merely by using a special committee or a majority of the minority vote; in that case, *Lynch* in its current form would still govern. To invoke the business judgment rule standard of review, the controller would have to replicate fully both elements of the arms-length merger process.

Through this modification, there would be an incentive for transactional planners to use the transactional structure that virtually all informed commentators believe is

most advantageous to minority stockholders. At the same time, by giving defendants the real option to get rid of cases on the pleadings, the integrity of the representative litigation process would be improved, as those cases that would be filed would involve plaintiffs and plaintiffs' lawyers who knew that they could only succeed by filing and actually prosecuting meritorious claims, and not by free riding on a special committee's work.

To provide even greater coherence to our law, the equitable standards governing going-private transactions with controlling stockholders could be sensibly unified through an extension of this reformed *Lynch* standard. That is, in the context of going-private transactions implemented by tender offers by controlling stockholders—so called *Siliconix*[4] transactions—the protections of *Pure Resources*[5] should be supplemented by subjecting the controlling stockholder to the entire fairness standard if a special committee recommended that the minority not tender. Because *Pure Resources* already requires the equivalent of an informed, uncoerced majority of the minority vote condition for a controller to avoid entire fairness review, the additional step of triggering fairness review when a controller proceeded against the views of the special committee would bring together both lines of our going-private jurisprudence in a sensible manner, providing stockholders with substantial procedural guarantees of fairness that work in tandem while minimizing the rote filing of makeweight cases. Reform of our common law in this manner also honors our law's traditions, by respecting the informed business judgment of disinterested directors and stockholders.

## II. *Factual Background*

Cox is one of the nation's largest broadband communications companies, with a particularly strong cable television franchise. Throughout its history, the eponymous Cox has been controlled by its founding family, the Coxes. At various times, the Family has found it convenient to take Cox public, in order to raise money from the public capital markets. At other times, the Family has found it preferable to run Cox as a private company.

As of the summer of 2004, Cox was a public company, whose shares were listed on the New York Stock Exchange. The Cox Family controlled 74% of Cox's voting power. By summer 2004, the Family decided that it would be in its best interest to acquire the remaining shares of Cox that it did not own—some 245.5 million shares—and to take Cox private again. This idea was broached with top management of Cox by Family representatives on the Cox board, including the Chairman James C. Kennedy. On August 1, 2004, a Cox board meeting was held at which the Family previewed its intention to offer to pay $32 per share as an initial bid in a merger transaction whereby the Family would acquire all of the public shares of Cox (the "Proposal"). In a letter that followed the meeting, the Family made clear that it expected that Cox would form a special committee of independent Cox directors (the "Special Committee") to respond to and negotiate its Proposal. Indeed, the Proposal specifically required approval by the Special Committee. The Family did not threaten to change the board in order to pursue a merger if the Special Committee did not find favor with its Proposal. But the Family did state that it would not

**4.** See *In re Siliconix Inc. Shareholders Litig.,* 2001 WL 716787 (Del.Ch. June 19, 2001).

**5.** *In re Pure Resources, Inc., Shareholders Litig.,* 808 A.2d 421 (Del.Ch.2002).

sell its Cox shares or support a sale of Cox to a third party.

At 4:06 a.m. on the next morning, August 2, the Proposal was announced publicly before the markets opened. The Proposal set in course two separate strands of activity. One involved the formation and start of work by the Special Committee. The other involved a race to the courthouse by various plaintiffs. I describe the latter activity first because it took place largely without any consideration of what the Special Committee was planning to do. After describing the initial jockeying among the plaintiffs, I will return to discuss the key events that led to an actual transaction between the Family and Cox, and the settlement of this litigation.

### A. The Plaintiffs Rush To Court To Challenge The Negotiable Proposal

Beginning at 8:36 a.m. on August 2, and continuing throughout the day, a flurry of hastily drafted complaints were filed with this court. The first of the complaints consisted of paragraphs cobbled together from public documents, and rested on the core premises that Cox was poised for growth, that the Family's Proposal undervalued the company, that the offer was timed to allow the Family to reap for itself Cox's expected profits from heavy capital investments made in recent years, and that the directors of Cox were acquiescing to the Family's wishes. At 9:28 a.m., the Abbey Gardy firm, which is lead counsel in this action, filed its initial complaint, the second complaint filed that morning. That complaint was even less meaty than the first filed complaint. It is exemplary of hastily-filed, first-day complaints that serve no purpose other than for a particular law firm and its client to get into the medal round of the filing speed (also for-

merly known as the lead counsel selection) Olympics. The complaint's allegations were entirely boilerplate, with no particular relevance to the situation facing Cox. Most notably, the complaint's strained accusations of wrongdoing reflected, but did not maturely and thoughtfully confront, the reality that the Family's Proposal was just that, a proposal, subject to the expected evaluation of a Special Committee of independent directors, which would soon be formed and have the chance to hire advisors.

By the end of the day, six complaints of this ilk were filed in this court.[6] Within the next week or so, a couple of notable events occurred. First, the Prickett Jones firm filed a much more factually detailed complaint than any of the others on file to date. It reflected some factual research and set forth a creative, although ultimately non-viable, argument based on an, at best, strained reading of the Cox charter. At a minimum, however, the complaint was modestly superior insofar as it actually set forth specific facts in support of its contention that the Family's $32 offer was unfairly low.

Second and relatedly, the Abbey Gardy firm filed another complaint on behalf of a new plaintiff, M & R Capital Management, Inc., which owned 178,067 shares of Cox. I say relatedly for the obvious reason that the Abbey Gardy firm had a self-interest in obtaining another client with bigger holdings. That firm is no ingénue to the lead counsel sweepstakes and knew that courts were giving increasing weight to two factors other than speed of filing, to wit, the quality of the pleading filed and the size of the plaintiff's holdings. Having not been first to the party, and having not filed the best complaint, Abbey Gardy could only maximize its chances of being

---

**6.** Eventually, thirteen complaints were filed in Delaware, and three in Georgia.

lead counsel by procuring the plaintiff with the biggest holdings and convincing its colleagues at the plaintiffs' bar to propose that it be the firm to lead the sled team— that is, that Abbey Gardy be selected to mush the "Executive Committee" of the plaintiffs' firms who were challenging the Family's Proposal.

A food fight then ensued among the plaintiffs' firms for lead counsel status. The Prickett Jones firm filed motions to expedite and to consolidate the cases under a committee structure it would lead. The rest of the filing plaintiffs lined up behind Abbey Gardy. The fight was resolved at a hearing on August 24, and confirmed in an order dated August 30, in which the court determined that Abbey Gardy would be lead counsel. Importantly, this decision was based not on the results of the plebiscite held among the plaintiffs' lawyers about this issue but by the refusal of the Prickett Jones firm to even participate. The court made clear that it would give no weight to a process that was tilted unfairly and that it took into account rational factors, such as the quality of the pleadings. Given the large stock holdings of the Abbey Gardy firm's client, the support it had from the other firms, and the improved (if still premature) complaint it had filed and proposed as the consolidated complaint—as well as its pledge to include the Prickett Jones firm in a fair allocation of the work—Abbey Gardy prevailed in the contest. Prickett Jones, however, was added to the Executive Committee by consent.

The court largely denied the motion to expedite, for the obvious reason that there was as yet no transaction to enjoin. The only thing on the table was a Proposal by the Family that was subject to ongoing examination and negotiation by the Cox board through its Special Committee. For the convenience of the court and the parties, including the defendants, the court encouraged the defendants to provide a rolling production of documents that would not compromise the special committee's negotiating position. This admonition merely reflected a desire to avoid an unnecessary time crunch later in the event of either a challenge to whatever deal resulted or a settlement. The court's encouragement also reflected the reality that any amended complaint that the plaintiffs' might file against an ultimate merger agreement could not be dismissed, per the teachings of *Kahn v. Lynch Communication Systems, Inc.*,[7] if the plaintiffs could plausibly allege unfairness.

As it turns out, the denial of the motion to expedite was the last substantial activity that would occur in the litigation challenging the Proposal until the consideration of the settlement itself. All the important events were transpiring on the business front, even those that involved the plaintiffs themselves. I therefore describe the course of those events next.

B. *Getting To A Deal And A Settlement: A Tale Of Two Negotiation Paths Leading To The Same Place At the Same Time*

After the public announcement of the Proposal, the Cox board formed the Special Committee as anticipated in the Family's Proposal. It was comprised of three Cox directors who were not employees or officers of Cox, or otherwise affiliates of the Family, including Janet M. Clarke who was the Chairwoman. The board resolution creating the Special Committee specifically stated that the Cox board would not authorize or recommend any transaction with the Family unless the transaction was

---

**7.** 638 A.2d 1110 (Del.1994).

recommended to the full board by the Special Committee.

On August 5, 2004, the Special Committee selected Fried, Frank, Harris, Shriver & Jacobson LLP as its legal counsel. On August 16, the Special Committee retained Goldman, Sachs & Co. as its financial advisor. After that, the Special Committee, with the aid of its advisors, gathered public and non-public financial information about Cox and its prospects, including non-public projections of the company's future performance. The Special Committee did so for the evident purposes of considering the attractiveness of Cox's opening bid and determining how to respond to that bid. During this stage, the Special Committee communicated with representatives of the Family to understand the basis for the Proposal and to hear their views about value. Goldman Sachs used this input and other information to develop valuation information to help its clients develop a bargaining position.

By late September, the Special Committee had worked with Goldman Sachs to develop a presentation to the Family's financial advisors. That presentation was designed to impress upon the Family the Special Committee's view that Cox had a bright future and should be valued much higher than the Proposal's $32 per share price. In other words, the presentation was a negotiation document designed to help the Special Committee convince the Family of the sincerity of its view that it should substantially increase its initial bid. After the meeting with the financial advisors, Fried Frank met with the Family's legal advisors and expressed the Special Committee's desire that any merger or tender offer transaction be subject to a non-waivable majority of minority approval condition or "Minority Approval Condition."

On October 4, 2004, the Special Committee initiated the beginning of real negotiations by sending a letter to the Family unanimously rejecting the $32 price as unacceptable. Various rounds of discussions were had, at which the Family's and the Special Committee's financial advisors jousted over value. On October 11, the Family raised its bid to $33.50 per share and hinted that this might be its final bid. The next day, the Special Committee communicated to the Family that if the $33.50 bid was the Family's final bid, it would be rejected, and if that bid was intended to lead to a deal at $35.00, then the Family should know that the Special Committee would reject that price as well.

By this time, the plaintiffs in this case, through their lead counsel, Arthur N. Abbey of Abbey Gardy, had been invited into the negotiation dance by the Family's litigation counsel, Kevin G. Abrams of Richards Layton & Finger, but on a separate track from the Special Committee. On October 12, the plaintiffs' counsel and their financial advisor, Richard L. Smithline,[8] met with the financial and legal advisors for the Family. Smithline presented valuation materials designed to support the plaintiffs' position that the Family should raise its bid to at least $38 per share. The plaintiffs were not informed, apparently, that the Family had already told the Special Committee that it was prepared to raise its bid to $33.50.

This established a pattern. The Special Committee dealt with the Family in a direct manner: Clarke had direct contact with the Family's key representative, Ken-

---

8. Smithline heads DC Asset Management, a private investment firm where he manages a hedge fund specializing in the media and telecommunications sectors. He is a former managing director of the Media/Telecommunications Group at Dresdener Kleinwort Wasserstein (formerly Wasserstein Perella).

nedy, as well as through communications between the Special Committee's advisors and the Family's advisors. By contrast, the plaintiffs, as might be expected, dealt exclusively with litigation counsel for the Family, aside from the one meeting at which the plaintiffs' financial advisors were given the opportunity to make a presentation to the Family's financial advisors. Litigation counsel for the Family decided what, if any, information the plaintiffs would be told about the bargaining dynamic between the Special Committee and the Family.

Consistent with this pattern, on October 12, Kennedy called Clarke and told her that the Family would withdraw its $33.50 offer unless an in-person meeting between principals for the Family and the Special Committee members themselves resulted in an agreement. It was eventually agreed that this meeting would occur on October 15.

Meanwhile, on October 13, Abrams told Abbey that the Family might raise its offer to $33.50 and might agree to a majority of the minority condition. Later that day, Abbey told Abrams that the plaintiffs would accept a settlement at $37 per share with a Minority Approval Condition.

On October 15, Kennedy and one of his top subordinates for the Family's Holding Company met with the Special Committee. No advisors were present. After some discussion, Kennedy indicated that the Family might raise its offer to $34 per share. After even more talk, Kennedy signaled a willingness to offer $34.50 with the proviso that if the Special Committee did not accept that price, the Family would cease consideration of taking Cox private.

The Special Committee adjourned to caucus with their advisors. Upon their return, Clarke told Kennedy that the Special Committee would not recommend a price lower than $35.25 per share. Kennedy responded that if that was the Special Committee's position, the Family would withdraw its Proposal.

The Special Committee then caucused again with its advisors. Clarke was empowered to negotiate the best obtainable price, subject to a confirming opinion as to financial fairness by Goldman Sachs, agreement to a Minority Approval Condition, settlement of this litigation, and negotiation of a merger agreement.

Clarke met with Kennedy later that day. She said the Special Committee would accept a deal at $35 per share. Naturally, having framed the bidding this way, Clarke opened the door to Kennedy offering to split the difference between his previous $34.50 overture and her $35 price. Kennedy did so and Clarke agreed that the Special Committee would recommend that $34.75 per share price, subject to the conditions described.

After that occurred, Abrams was informed of the state of play. He called Abbey and told him that the Family's "best and final offer" was $34.75 per share and that the Family would not settle this case at any higher price.[9] Abbey remembers being told that this was the Family's "best and absolutely final offer."[10] I have little doubt that, without being explicitly told so, Abbey knew that this meant that the Family had likely reached the end of its bargaining process with the Special Committee. As Abrams stated in court, he told Abbey that the Family was "prepared to proceed with this transaction without you."[11] As Abrams also noted,

9. Abrams Aff. ¶ 13.

10. Abbey Aff. ¶ 32.

11. 1/26/05 Tr. at 35.

"[Mr. Abbey] knows that when I say best and final, that's it, and he was not going to get an additional penny from me." [12] In other words, Abbey was told that the proverbial "train was leaving the station."

Abbey told Abrams that he would consider the offer in consultation with the plaintiffs' financial advisor but that the deal would also have to include a Minority Approval Condition. The next morning Abbey orally agreed to these terms. Abrams promptly informed the Special Committee's lawyers and the transactional counsel for the Family that the litigation was settled in principle and that a formal Memorandum of Understanding would be prepared.

As of that time, the Special Committee's financial advisors were finalizing their analysis in advance of determining whether they could deliver a fairness opinion. The Special Committee and the Family were also negotiating the terms of the actual merger agreement.

By October 18, the Special Committee and the Family reached accord on a final merger contract. The Special Committee met and received a favorable fairness presentation from Goldman Sachs. After receiving that, the Special Committee unanimously recommended the merger to the full board. At a later meeting, the full Cox board also voted to approve the deal based upon the recommendation of the Special Committee.

That same day, Abrams and Abbey reached agreement on an MOU stating that the Family acknowledged that the desirability of settling this action and the efforts of the plaintiffs' counsel in this action were causal factors that led to the Family increasing its bid to $34.75, and agreeing to the Minority Approval Condition. A similar MOU was also executed

with a group of plaintiffs who had filed similar actions in Georgia. The negotiations involving those plaintiffs are not described in the record before me in any detail.

The next day, October 19, Cox and the Family signed the merger agreement.

### C. The Settlement Is Presented To The Court For Approval And The Merger Closes

The parties moved promptly to complete confirmatory discovery and negotiate a final stipulation of settlement. Only after that was done, they swear, was there any discussion of the amount of attorneys fees the plaintiffs' counsel would seek.

In the attorneys' fee negotiations, the Family eventually agreed not to oppose a fee request of up to $4.95 million. Separately, the Family forged a deal by which it agreed not to oppose a fee request from the Georgia plaintiffs of more than $1.25 million. In both cases, the Family agreed to pay whatever fee was awarded rather than to require that any fee award be withheld from the merger consideration to be paid to the public stockholders of Cox. According to the plaintiffs' counsel Arthur Abbey, he would have sought a fee much larger than $4.95 million had the defendants refused to agree not to oppose a fee request up to that amount.

The Stipulation of Settlement was presented to the court on November 10, 2004. Notice was promptly issued to the public stockholders on November 24, 2004. By that time, the Family had already commenced their tender offer at $34.75 per share.

On December 2, 2004, the tender offer expired. Approximately 189.7 million of Cox's 245.5 million public shares were ten-

---

**12.** *Id.* at 39.

dered, satisfying the Minority Approval Condition and giving the Family over 90% of the Cox shares. On December 8, 2004, a back end, short-form merger was executed taking Cox private.

### III. Objectors To The Plaintiffs' Fee Emerge

When the deadline to object to the proposed settlement expired, no objections to the settlement itself had been filed. But an objection was made to the plaintiffs' counsel request for an award of attorneys' fees. The objection was filed by Jeffrey Zoub and eleven funds managed by Franklin Mutual Advisers LLC ("Franklin Funds"). Zoub owned 1000 Cox shares as of the date the Proposal was first publicly announced and continued to hold those shares until the merger. Meanwhile, the Franklin Funds had a much greater stake, consisting of 509,000 shares. But the Franklin Funds were the opposite of long-term stockholders—they did not begin purchasing Cox shares until after the announcement that the Family wished to take Cox private, thus making the relatively safe bets that a deal would ultimately be made and at a price higher than the Family's original $32 offer.

One senses, moreover, that the objectors were not entirely self-motivated but rather were inspired to object by one of their attorneys, Elliott J. Weiss, a Professor of Law at the University of Arizona Law School. In recent years, Weiss has himself appeared as an objecting stockholder to fee requests in this court. And much of his recent scholarship has focused on what he regards to be failures in the integrity and efficiency of corporate and securities class action litigation. Most notably, his

work helped inspire provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA") designed to give stockholders with large equity holdings an advantage in securing lead plaintiff status in federal securities class actions.[13]

For present purposes, however, it is more relevant that Weiss has recently turned his attention to the class action settlement process in corporate law cases, most particularly in the courts of Delaware. Aside from objecting in two cases himself, Weiss, along with Professor Lawrence J. White, an economist at New York University, has published an article called *File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions*[14] that argues that certain features of Delaware's common law of corporations have permitted the plaintiffs' bar to reap windfall profits by filing cases that have no benefit to stockholders.

I highlight the article because Weiss's advocacy on behalf of the objectors as an attorney, which includes his filing of an affidavit by his co-author White attaching their article, essentially consists of the conversion of a particular part of his article into a brief to this court. The points that the objectors make, in other words, have less to do with this case in particular, and more to do with concerns about how the common law rules that Delaware uses to govern mergers with controlling stockholders create inefficient incentives for plaintiffs' lawyers and corporate defense counsel, leading to lawsuits that exist, in Weiss's view, almost entirely as a vehicle for the payment of attorneys' fees and the entry of a judgment of the court providing

---

**13.** *E.g.*, Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J.2053 (1995).

**14.** 57 Vand. L.Rev. 1797 (2004).

the defendants with a broad release from any future lawsuits relating to the underlying transactions. At oral argument, Weiss conceded that his client's objection to the fee in this particular case was not driven by anything unusual about the Cox merger but rather by their objection to the perpetuation of a pattern of settlements and fee requests like this one, and that their objection had reform of the law as its principle objective.

For that reason, it is important to set forth in some detail the objectors' argument that no fee should be awarded, a task that requires a description of the legal framework within which settlements of this type arise.

## IV. *Legal Analysis*

### A. *The Delaware Law Of Mergers With Controlling Stockholders*

It would not be much of a stretch to say that the central idea of Delaware's approach to corporation law is the empowerment of centralized management, in the form of boards of directors and the subordinate officers they choose, to make disinterested business decisions. The business judgment rule exemplifies and animates this idea.

But this idea also presents to corporate law makers—of both the statutory and common law variety—a correlative challenge that has occupied most of the last century of American corporation law: how to regulate transactions between corporations and their own directors, officers, or controlling stockholders. And, with the later emergence of a vibrant market for corporate control, came the need to address the extent to which certain corporate transactions with, or defensive reactions towards, third parties sufficiently implicate

the self-interest of directors and officers as to cast doubt on their ability to pursue their corporations' best interests with unconflicted fidelity. In other words, for the law of corporations, much of the hard thinking has been what to do about business decisions in which directors have non-stockholder interests that might bias their judgment.

By the enactment of the comprehensive revision of the Delaware General Corporation Law in 1967, the Delaware law of corporations had long accepted the notion that it was unwise to ban interested transactions altogether. Consistent with that premise, the revised DGCL addressed interested transactions by crafting a legal incentive system for vesting decision-making authority over such transactions in those who were not burdened with a conflict. To that end, § 144 of the DGCL says that a transaction between a corporation and an officer or director is not per se voidable so long as the transaction is approved, after full disclosure, either by: 1) a majority of the disinterested directors; or 2) a good faith vote of the stockholders.[15] By those methods, respect for the business judgment of the board can be maintained with integrity, because the law has taken into account the conflict and required that the business judgment be either proposed by the disinterested directors or ratified by the stockholders it affects. In the absence of those protections, the transaction is presumed voidable absent a demonstration, by the interested party, that the transaction is fair.[16]

Lest I be chastened by learned commentators on our law, I must hasten to add that § 144 has been interpreted as dealing solely with the problem of per se invalidity; that is, as addressing only the common law principle that interested transactions

---

**15.** *8 Del. C.* § 144(b)(1), (2).

**16.** *8 Del. C.* § 144(b)(3).

were entirely invalid and providing a road map for transactional planners to avoid that fate.[17] The somewhat different question of when an interested transaction might give rise to a claim for breach of fiduciary duty—i.e., to a claim in equity—was left to the common law of corporations to answer. Mere compliance with § 144 did not necessarily suffice.

But the common law of corporations also was centered on the idea of the business judgment rule and its approach to interested transactions looked much like that codified in § 144. The approval by a majority of the disinterested directors of an interested transaction was held to invoke the business judgment rule standard of review, and to relieve the proponents of the burden to show that the transaction was entirely fair to the corporation.[18] But a good example of the distinction between § 144 and the common law of corporations is their disparate approach to stockholder ratification. By its own terms, § 144 alleviates the possibility of per se invalidity by a vote of stockholders, without any explicit requirement that a majority of the disinterested stockholders approve.[19] The common law, by contrast, only gives ratification effect to approval of the interested transaction by a majority of the disinterested stockholders.[20]

This example helps make another point, which is the continuing struggle in our law to determine how to balance the goals of respecting business judgments made by boards and protecting stockholders from abuse from self-interested fiduciaries. In the 1980s, much of what was most compelling and urgent in corporation law, was the judiciary's articulation of the freedom that directors had to address hostile takeover bids. At least in our law, what emerged were common law rules that encouraged boards to invest decision-making primacy in outside directors rather than insiders, because it was presumed that outside directors, as opposed to CEOs and CFOs who had their primary jobs at stake, would be less likely to resist a takeover simply to remain directors of a public company. When independent directors were given substantial authority, the law was more willing to conclude that the board's actions in resisting a takeover were permissible. But even then, the "omnipresent specter that a board may be acting in its own interest, rather than those of the corporation and its shareholders" subjected defensive actions to heightened scrutiny, under a reasonableness form of review that was tighter than the bare rationality test of the business judgment rule.[21]

For present purposes, what is most critical is how the Delaware Supreme Court addressed the standard of review that would apply to a very particular type of interested transaction: a merger in which

---

17. *See* David A. Drexler, Lewis S. Black & A. Gilchrist Sparks, III, *Delaware Corporation Law and Practice,* § 15.05[2] at 15–22 (2004).

18. *Puma v. Marriott,* 283 A.2d 693, 694 (Del. Ch.1971) (finding that because an independent board majority approved a transaction with a 46% stockholder, the business judgment rule standard applied).

19. The reference to the approval of stockholders being made in "good faith" in § 144(b)(2) might be read as imposing a requirement on an interested party to the transaction that its

approving vote as a stockholder to refrain from using its voting power to push through a transaction unfair to the corporation and correspondingly overgenerous to the interested party.

20. *E.g., Harbor Finance Partners v. Huizenga,* 751 A.2d 879, 900–01 (Del.Ch.1999).

21. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985); *see also Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1986).

a controlling stockholder acquires the rest of the shares it did not control. Within the Court of Chancery, there was some doctrinal debate about whether a merger with a controlling stockholder could be structured in a manner that would invoke the business judgment rule standard of review. In *In re Trans World Airlines, Inc. Shareholders Litigation*,[22] Chancellor Allen suggested that if the merger was negotiated and approved by a special committee of independent directors, then the business judgment rule standard of review should apply. By contrast, in *Citron v. E.I. DuPont De Nemours & Co.*,[23] Vice Chancellor Jacobs held that even if the merger was approved by a fully informed majority of the minority vote, the entire fairness standard would still apply because of the implicit coercion that the electorate would feel in voting.[24] Their fear that the controller would retaliate against a negative vote, Vice Chancellor Jacobs suggested, rendered a Minority Approval Condition an insufficient guarantee of fairness in this unique transactional context to give that vote ratification effect.[25]

In the important case of *Kahn v. Lynch Communication, Inc.*,[26] the Delaware Supreme Court resolved this doctrinal debate. In its decision, the Supreme Court held that regardless of the procedural pro-tections employed, a merger with a controlling stockholder would always be subject to the entire fairness standard. Even if the transaction was 1) negotiated and approved by a special committee of independent directors; and 2) subject to approval by a majority of the disinterested shares (i.e., those shares not held by the controller or its affiliates), the best that could be achieved was a shift of the burden of persuasion on the issue of fairness from the defendants to the plaintiffs. In reaching this decision, the Supreme Court expressly relied on *Citron's* reasoning about the implicit coercion thought to be felt by minority stockholders in this transactional context.[27] Less clear is why the Supreme Court refused to give weight to independent director approval, given that *Aronson v. Lewis*[28] had held that independent directors were presumed to be capable of exercising a disinterested business judgment in deciding whether to cause the company to sue a controlling stockholder. In part, *Lynch's* decision on this score seemed to turn on a vestigial concept from a discarded body of case law; namely, that because there no longer needed to be a "business purpose" for a merger with a controlling stockholder,[29] it was somehow not a "business judgment" for independent directors to conclude that a merger was in

---

**22.** 1988 WL 111271 (Del.Ch. Oct.21, 1988).

**23.** 584 A.2d 490 (Del.Ch.1990).

**24.** From a close reading of the *Citron* decision, one discerns that Vice Chancellor Jacobs felt the *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983) and *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del.1985) had already decided the key question and that he was bound to that determination. *Citron*, 584 A.2d at 500–01. He therefore attempted to craft a rationale for what he perceived to be the Supreme Court's binding refusal to give business judgment rule treatment to a merger subject to a Minority Approval Condition. *Id.* at 502.

**25.** 584 A.2d at 502 (articulating this implicit coercion rationale).

**26.** 638 A.2d 1110 (Del.1994).

**27.** 638 A.2d at 1116–17 (citing *Citron*, 584 A.2d at 502).

**28.** 473 A.2d 805 (Del.1984).

**29.** *Weinberger* eliminated this requirement, which was the rule of *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977). *See Weinberger*, 457 A.2d at 715.

the best interests of the minority stockholders.[30]

That is an odd and unsatisfying rationale, which, if taken seriously, would have implications for all decisions by directors who agree to cash mergers. All in all, it is perhaps fairest and more sensible to read *Lynch* as being premised on a sincere concern that mergers with controlling stockholders involve an extraordinary potential for the exploitation by powerful insiders of their informational advantages and their voting clout. Facing the proverbial 800 pound gorilla who wants the rest of the bananas all for himself, chimpanzees like independent directors and disinterested stockholders could not be expected to make sure that the gorilla paid a fair price.[31] Therefore, the residual protection of an unavoidable review of the financial fairness whenever plaintiffs could raise a genuine dispute of fact about that issue was thought to be a necessary final protection. But, in order to encourage the use of procedural devices such as special committees and Minority Approval Conditions that tended to encourage fair pricing, the Court did give transactional proponents a modest procedural benefit—the shifting of the burden of persuasion on the ultimate issue of fairness to the plaintiffs—if the transaction proponents proved, in a factually intensive way, that the procedural devices had, in fact, operated with integrity.[32] In the case of a special committee, later case law held that the defendants would only be relieved of the burden of proving fairness if it first proved that "the committee function[ed] in a manner which indi-

cates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power."[33] In the case of a Minority Approval Condition, the defendants had the usual ratification burden—to show that all material facts had been disclosed and the absence of coercive threats. But in either event, or in the exceedingly rare case in which both protections were employed in advance of, and not as part of a negotiated settlement, the most the defendants could get was a burden shift.

Although it is an undeniable reality that *Lynch* stated that any merger with a controlling stockholder, however structured, was subject to a fairness review, it would be unfair not to make explicit another reality. No defendant in *Lynch,* and no defendant since, has argued that the use of an independent special committee *and* a Minority Approval Condition sufficiently alleviates any implicit coercion as to justify invocation of the business judgment rule. For this reason, it is important not to assume that the Supreme Court has already rejected this more precisely focused contention.

## B. *A Tempered Description Of The Objectors' Criticism Of The Incentive Effects Created By Lynch*

The incentive effects created by *Lynch* are largely what inspire the objectors' position. Rather than describe the objectors' position with same fervor with which they articulate it, I will instead describe the more reasonable aspects of their argu-

---

**30.** *Lynch,* 638 A.2d at 1115–16.

**31.** *See Pure Resources,* 808 A.2d 421, 436 (Del.Ch.2002); Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations,* 27 Del. J. Corp. L. 499, 509 (2002) (both describing the evolution of this thinking).

**32.** 638 A.2d at 1117.

**33.** *Kahn v. Tremont Corp.,* 694 A.2d 422, 429 (Del.1997); *see also In re Cysive, Inc. Shareholders Litig.,* 836 A.2d 531, 548–49 (Del.Ch. 2003) (explaining why this approach makes the question of burden-shifting conflate with the question of procedural fairness).

ments as I distill them, drawing on the record the parties have presented and the many other settlements of this kind that have been presented to the Court of Chancery. Thus, my rendition will be far less tendentious and will, also, by more closely reflecting my own ultimate perceptions, reduce, but not, alas, eliminate, the need to describe the to and fro between the objectors to the fee and the plaintiffs who seek it.

Initially, it cannot be ignored that *Lynch* created a strong incentive for the use of special negotiating committees in addressing mergers with controlling stockholders. This is a very useful incentive. In the main, the experience with such committees has been a positive one. Independent directors have increasingly understood and aggressively undertaken the burdens of acting as a guarantor of the minority's interest, by undertaking a deep examination of the economics of the transactions they confront and developing effective negotiation strategies to extract value for the minority from the controller. Critical to the effectiveness of the special committee process has been the selection of experienced financial and legal advisors, who can help the special committee overcome the lack of managerial expertise at their disposal. When it works well, the combination of a special committee, with general business acumen and a fair amount of company specific knowledge, with wily advisors who know how to pull the levers in merger transactions in order to extract economic advantage, is a potent one of large benefit to minority stockholders.

But *Lynch* also created other unintended and unanticipated incentive effects which the objectors point out. For starters, the absence of any additional standard of review-affecting benefit for a Minority Approval Condition, has made the use of that independent, and functionally distinct, mechanism less prevalent.[34] From a controller's standpoint, accepting this condition from the inception of the negotiating process added an element of transactional risk without much liability-insulating compensation in exchange. Therefore, controllers were unlikely to accept a Minority Approval Condition as an initial requirement, and would, at most, agree to such a Condition at the insistence of a special committee and/or as a way to settle with the plaintiffs.

As a result, *Lynch* did not tend to make prevalent the transactional structure that most clearly mirrors an arms' length merger. In an arms' length merger, the DGCL requires two independent approvals, which it is fair to say serve independent integrity-enforcing functions. The first approval is by the board.[35] In a third-party merger, it is presumed that the board is disinterested and used to full advantage the capability of centralized management to act as an expert bargaining agent. The active agency of centralized management to test the market and bargain is not something that the stockholders can do for themselves. But in a third-party merger, the stockholders are also given an important role. They get to hold their bargaining agent's feet to the fire by wielding the power at the ballot box to either ratify or reject their agent's work

---

34. The plaintiffs' own well-respected expert agrees that this is a negative aspect of *Lynch*. Guhan Subramanian, *Post–Siliconix Freezeouts: Theory and Evidence* (Harvard Law School Olin Series Discussion Paper # 472, August 2004) at 19; *see also* Guhan Subrama-nian, *Fixing Freezeouts*, —— Yale L.J. —— (forthcoming 2005) (Harvard Law School Olin Series Discussion Paper # 501, December 2004) at 46–48.

35. 8 *Del. C.* § 251(b).

product.[36] By this method, the principals (i.e., the stockholders) get to protect themselves by voting no if they believe that their bargaining agent has done a poor job, for whatever reason. Operating to give this approval step real meaning are legal requirements prohibiting coercion in the voting process and requiring the disclosure of all material facts bearing on the approval decision.[37]

These steps are in important ways complements and not substitutes. A good board is best positioned to extract a price at the highest possible level because it does not suffer from the collective action problem of disaggregated stockholders. But boards are rarely comprised of independent directors whose own financial futures depend importantly on getting the best price and, history shows, are sometimes timid, inept, or ..., well, let's just say worse. Although stockholders are not well positioned to use the voting process to get the last nickel out of a purchaser, they are well positioned to police bad deals in which the board did not at least obtain something in the amorphous "range" of financial fairness.

In the context of a merger with controlling stockholder, the complementary role of disinterested director and disinterested stockholder approval is difficult to conceive of as less important. For a variety of obvious reasons (e.g., informational asymmetries, the possibility that the outside directors might be more independent in appearance than in substance, or might lack the savvy to effectively counter the controller), the integrity-enforcing utility of a Minority Approval Condition seems hard to dispute.[38] And, with increasingly active institutional investors and easier information flows, stockholders have never been better positioned to make a judgment as to whether a special committee has done its job. At the same time, the ability of disaggregated stockholders to reject by a binary up or down vote obviously "unfair" deals does not translate into their ability to do what an effective special committee can do, which is to negotiate effectively and strike a bargain much higher in the range of fairness. As a practical matter, however, the effect of *Lynch* in the real world of transactions was to generate the use of special committees alone.

The incentive system that *Lynch* created for plaintiffs' lawyers is its most problematic feature, however, and the consequence that motivates the objectors' contentions here. After *Lynch*, there arose a pattern of which this case is simply one of the latest examples.

Unlike any other transaction one can imagine—even a *Revlon* deal—it was impossible after *Lynch* to structure a merger with a controlling stockholder in a way that permitted the defendants to obtain a dismissal of the case on the pleadings.

36. 8 *Del. C.* § 251(c).

37. *E.g., Williams v. Geier,* 671 A.2d 1368, 1382–83 (Del.1996) (actual or structural coercion of voters is improper and can void a transaction); *Zirn v. VLI Corp.,* 621 A.2d 773 (Del.1993) (all material facts bearing on a merger decision must be disclosed by the board).

38. For example, I presided over a case in which a special committee approved a merger with a controlling stockholder by buying the stock of another company at a huge premium to market at a time when the other company was arguably insolvent and its debt was trading at 25 cents on the dollar. In that case, it was obvious from the start that the disinterested stockholders would have rejected the transaction and it was structured precisely to avoid that vote. After I rejected a proposed settlement, the suit to rescind the transaction eventually succeeded when the defendants voluntarily agreed to rescind the merger. *In re M & F Worldwide Corp. Shareholders Litig.,* C.A. No. 18502, 799 A.2d 1164 (Del.Ch.2002).

Imagine, for example, a controlled company on the board of which sat Bill Gates and Warren Buffett. Each owned 5% of the company and had no other business dealings with the controller. The controller announced that it was offering a 25% premium to market to buy the rest of the shares. The controlled company's board meets and appoints Gates and Buffett as a special committee. The board also resolves that it will not agree to a merger unless the special committee recommends it and unless the merger is conditioned on approval by two-thirds of the disinterested stockholders. The special committee hires a top five investment bank and top five law firm and negotiates the price up to a 38% premium. The special committee then votes to approve the deal and the full board accepts their recommendation. The disinterested stockholders vote to approve the deal by a huge margin that satisfies the two-thirds Minority Approval Condition.

After that occurs, a lawsuit is filed alleging that the price paid is unfair. The filing party can satisfy Rule 11 as to that allegation because financial fairness is a debatable issue and the plaintiff has at least a colorable position. The controller and the special committee go to their respective legal advisors and ask them to get this frivolous lawsuit dismissed. What they will be told is this, "We cannot get the case dismissed. We can attempt to show the plaintiffs that we are willing to beat them on this and persuade them to drop it voluntarily because they will, after great expense, lose. But if they want to fight a motion to dismiss, they will win, see *Lynch.* At the very least, therefore, if the plaintiffs are willing to fight, it would be rational for you to pay an amount to settle the case that reflects not only the actual out-of-pocket costs of defense to get the case to the summary judgment stage, but the (real but harder to quantify) costs of managerial and directorial time in responding to discovery over a past transaction."

For both the proponents of mergers with controlling stockholders (i.e., controllers and the directors involved in the transactions, all of whom become defendants in lawsuits attacking those transactions) and the plaintiffs' lawyers who file suits, this incentive effect of *Lynch* manifested itself in a unique approach to "litigation." Instead of suing once a controller actually signs up a merger agreement with a special committee of independent directors, plaintiffs sue as soon as there is a public announcement of the controller's intention to propose a merger.

This case is typical of that phenomenon because the plaintiffs sued the same day that the Family announced it was prepared to buy the rest of the Cox shares. The suits were filed despite the express indication that the Family was going to negotiate its $32 per share opening bid with a special committee of independent directors and the absence of any attempt to coerce that committee or to rush it in its work.

In this regard, this case is paradigmatic. And that is what bothers the objectors.

To understand why, one must grasp what typically happens in these suits attacking a proposal to negotiate a transaction. After the suits are filed, the special committee gets down to its work. The litigation meanwhile remains dormant for the obvious reason that there is no agreed-upon transaction to challenge, by way of injunction or otherwise.

After the special committee completes its analysis of value and is ready to negotiate price and conditions, the activity heats up and the special committee begins bargaining—the so-called "first track." At some point in the negotiation process, the defendants—usually through the control-

ler—open up a "second track" of negotiations with the plaintiffs' counsel. Increasingly, in this second track, the plaintiffs engage a financial advisor of their own, whose work is shared with the defendants in an effort to show that the controller's original offer was unfair and that a higher price should be paid in order to avoid a lawsuit. This second track proceeds in partial isolation from the first track in the sense that the plaintiffs' counsel is not made privy to all of the back and forth of the first track.

Indeed, the artistry of defense counsel is to bring the first and second tracks to the same destination at the same time. At some point towards the very end of the first track, the controller frames the negotiation with the special committee in a manner so that it can assure itself that the special committee is likely to accept a particular price subject to the negotiation of an acceptable merger agreement and the delivery of a final fairness opinion from the special committee's financial advisor. When that price is known but before there is a definitive deal, defense counsel (who by now has a sense of the plaintiffs' bargaining position) makes its "final and best offer" to plaintiffs' counsel. The plaintiffs' counsel then accepts via an MOU that is subject to confirmatory discovery.

As the objectors point out and this court has often noted in settlement hearings regarding these kind of cases in the past, the ritualistic nature of a process almost invariably resulting in the simultaneous bliss of three parties—the plaintiffs' lawyers, the special committee, and the controlling stockholders—is a jurisprudential triumph of an odd form of tantra. I say invariably because the record contains a shocking omission—the inability of the plaintiffs, despite their production of expert affidavits, to point to one instance in the precise context of a case of this kind (i.e., cases started by attacks on negotiable going-private proposals) of the plaintiffs' lawyers refusing to settle once a special committee has agreed on price with a controller.

That bears repeating. In no instance has there been a situation when the controller's lawyer told the plaintiffs' lawyer this is my best and final offer and received the answer, "sign up your deal with the special committee, and we'll meet you in the Chancellor's office for the scheduling conference on our motion to expedite." Rather, in every instance, the plaintiffs' lawyers have concluded that the price obtained by the special committee was sufficiently attractive, that the acceptance of a settlement at that price was warranted.[39]

The objectors use this admittedly material fact to buttress another argument they make about *Lynch*. That argument, which is again something members of this court have grasped for some time, rests in the ease for the plaintiffs' lawyers of achieving "success" in this ritual. When a controlling stockholder announces a "proposal" to negotiate a going private merger, the controller is, like any bidder, very unlikely to present his full reserve price as its opening bid. Moreover, given the nature of *Lynch* and its progeny, and their emphasis on the effectiveness of the special committee as a bargaining agent, the controller knows, and special committee members will demand, that real price negotiations proceed after the opening bid, and that those negotiations will almost certainly result in any consummated deal occurring at a higher price.

---

39. *See* Elliott J. Weiss & Lawrence J. White, *File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions,* 57 Vand. L.Rev. 1797, 1820 & n. 84, 1833–34 (2004); Weiss Aff. ¶ 15.

For plaintiffs' lawyers, the incentives are obvious.[40] By suing on the proposal, the plaintiffs' lawyers can claim that they are responsible, in part, for price increases in a deal context in which price increases are overwhelmingly likely to occur. Added to this incentive is the fact that the plaintiffs' lawyers know that the *Lynch* standard gives them the ability, on bare satisfaction of notice pleading standards and Rule 11, to defeat a motion to dismiss addressed to any complaint challenging an actual merger agreement with a special committee, even one conditioned on Minority Approval. Because of this ability, the plaintiffs' claims always have settlement value because of the costs of discovery and time to the defendants. Add to this another important ingredient, which is that once a special committee has negotiated a material price increase with the aid of well-regarded financial and legal advisors, the plaintiffs' lawyers can contend with a straight-face that it was better to help get the price up to where it ended than to risk that the controller would abandon the deal. Abandonment of the deal, the plaintiffs' lawyers will say with accuracy, will result in the company's stock price falling back to its pre-proposal level, which is always materially lower as it does not reflect the anticipation of a premium-generating going private transaction. Having vigorously aided the special committee to get into the range of fairness and having no reason to suspect that the special committee was disloyal to its mission, the plaintiffs' lawyers can say, in plausible good faith, that it

was better for the class to take this improved bid, which is now well within the range of fairness, rather than to risk abandonment of the transaction. Moreover, for those stockholders who wish to challenge the price, appraisal still remains an option.

In seeking fees in these cases, the plaintiffs' lawyers have been pragmatic. Recognizing that they, at best, can claim "shared credit" with the special committee, the plaintiffs' lawyers have tempered their fee requests and have asked for relatively small percentage of the "benefit"—i.e., the difference between the price of the controller's opening bid and the final merger price agreed to by the special committee.[41] But, at the same time, the rewards that they reap are substantial, especially when measured on an hourly basis and against the relative lack of risk that this kind of litigation entails.[42] With the incentive that *Lynch* provides to defense counsel to settle the case and put the threat of continued litigation behind them, the plaintiffs' bar knows that the defendants will be willing to concede that the price increase was due in some material way to their desire to settle the litigation. Furthermore, the plaintiffs know that this court had been modest in awarding fees in this context, so that defendants do not fear that a settlement would result in demands for huge fees that would either draw objectors or cause the controller (if it agrees to pay the fee, as is almost always the case) to bear too much additional pain.[43] All in all, this

---

**40.** *Cf.* Weiss & White, 57 Vand. L.Rev. at 1857 n. 183 (stating that the rule of *Lynch* "appears to have had the effect of encouraging plaintiffs' attorneys to settle cases challenging squeeze outs, largely without regard to whether the merger terms agreed to by an SNC [special negotiating committee] are entirely fair").

**41.** *E.g., Weiss & White,* 57 Vand. L.Rev. at 1831.

**42.** *E.g., id.* at 1830.

**43.** The agreement to pay the fee is pragmatic. By this means, the merger can close promptly and, because the fee does not directly affect the class, the incentive to raise objections to the settlement is lessened.

is a story that the objectors regard as indicative of a broken element of our system of representative litigation.

### C. *Siliconix: Another Road To Going Private Is Paved*

Of course, things cannot be quite that simple. And they are not. To describe why, I must add more jurisprudential context and then bring in the arguments raised by the plaintiffs' experts.

Under Delaware law, the doctrine of independent legal significance exists. That doctrine permits corporations to take, if the DGCL permits it, a variety of transactional routes to the same destination. For years, there had existed a strand of Delaware law that stated that a controlling stockholder who made a tender offer—as opposed to a merger proposal—to acquire the rest of the controlled company's shares had no duty to offer a fair price. So long as the controller did not actually coerce the minority stockholders or commit a disclosure violation, its tender offer was immune from equitable intervention for breach of fiduciary duty. *Lynch v. Vickers Energy Corp.*[44] stands for this basic proposition, which was reaffirmed in *Solomon v. Pathe Communications Corp.*,[45] less than two years after *Lynch* was decided. In the tender offer context, the doctrine of implicit coercion that *Lynch* is premised upon was unrecognized, but the form of the transaction, rather than any reasoned analysis, apparently formed the implicit justification for the discrepancy.

The opportunity that the tender offer line of cases presented for transactional planners interested in deal certainty was tempered, however, by the unsettled nature of a related question. By their very nature, going private transactions involve the desire by a controlling stockholder to acquire all of the company and to avoid the costs that come with having other equity holders. In most tender offers, at least some percentage of the shares will not tender, not necessarily because the offer was too low, but for other reasons (lack of focus, administrative failures by brokers, etc.). At the controller's disposal was the short-form merger technique, which permitted a controller, without a formal process, to merge out the remaining stockholders if the controller's ownership had increased to 90% through the tender offer. But the uncertainty was whether the short-form merger would be subject to the *Lynch* standard. In *In re Unocal Exploration Corp. Shareholders Litigation,*[46] that uncertainty was resolved, with the Court of Chancery, and then the Supreme Court, holding that the short-form merger statute specifically contemplated the absence of any negotiation process and that to impose the entire fairness standard on such mergers would therefore intrude on the transactional freedom authorized by § 253. In that transactional context, stockholders who believed that the price was unfair had an exclusive remedy: appraisal.

After *Unocal Exploration* was decided by this court, transactional lawyers put together the *Solomon* strand of authority with that new certainty and generated a new, and less negotiation- and litigation-intensive route to going private: a front tender offer designed to get the controller 90% of the shares, coupled with a back-end short form merger. In subsequent cases in this Court, it was held that this method of transaction—which came to be known

---

**44.** 351 A.2d 570 (Del.Ch.1976), *rev'd on other grounds,* 383 A.2d 278 (Del.1977).

**45.** 672 A.2d 35, 39 (Del.1996).

**46.** 793 A.2d 329 (Del.Ch.2000), *aff'd,* 777 A.2d 242 (Del.2001).

by the first written decision addressing it—*In re Siliconix Inc. Shareholders Litigation*[47]—did not trigger entire fairness review so long as the offer was not actually coercive and there was full disclosure. In the later case of *Pure Resources*,[48] this Court held that the mere fact that the controller had taken the *Siliconix* route did not relieve it of fiduciary duties.[49] Although those duties did not include a duty to pay a fair price, the court held that a *Siliconix* transaction could be subject to fairness review to protect the minority unless:

(i) the offer is subject to a nonwaivable majority of the minority tender condition,

(ii) the controlling shareholder commits to consummate a short-form merger promptly after increasing its holdings above ninety percent,

(iii) the controlling shareholder "has made no retributive threats," and

(iv) the independent directors are given complete discretion and sufficient time "to react to the tender offer, by (at the very least) hiring their own advisors," providing a recommendation to the noncontrolling shareholders, and disclosing adequate information to allow the noncontrolling shareholders an opportunity for informed decision making.[50]

In *Pure Resources*, the relationship between the *Lynch* and *Siliconix* forms of transactions was explored in depth and the logical tension between our common law's disparate approach to the form of equitable review for those forms was acknowledged. Rather than subject the *Siliconix* form to the rigid *Lynch* standard, this court decided that it was better to formulate protective standards that were more flexible, with the hope that at a later stage the two strands could be made coherent, in a manner that addressed not only the need to protect minority stockholders but also the utility of providing a non-litigious route to effecting transactions that often were economically efficient both for the minority who received a premium and in the sense of creating more rationally organized corporations.[51]

Since *Siliconix* was decided, controllers have therefore had two different transactional methods to choose between in attempting to go private. One can imagine various reasons why a controller might prefer one route or the other, depending on variables like the controller's ownership stake, the extent of the public float, the presence of big holders, the desire for certainty and closure, and which route might yield the best price for it. For example, the further a controller was from 90% to begin with, the more attractive the merger route might be, and vice versa, simply for efficiency reasons in both cases.

## D. The Plaintiffs' Expert Counter Attack

For present purposes, however, what is relevant is the empirical evidence that the plaintiffs have submitted to counter the objectors' position. To confront the scholarly work of Weiss and White, who are of the view that litigation of this kind is of no material benefit to minority stockholders, the plaintiffs have submitted an affidavit

---

47. 2001 WL 716787 (Del.Ch. June 19, 2001).

48. 808 A.2d 421 (Del.Ch.2002).

49. 808 A.2d at 444–46.

50. Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Stockholders*, 152 U.

Pa. L.Rev. 785, 827–28 (2003) (paraphrasing and distilling the holdings of *Pure Resources*, 808 A.2d at 445).

51. 808 A.2d at 434–35, 443–44; *see also Cysive*, 836 A.2d 531, 549–51 (Del.Ch.2003).

from Professor Guhan Subramanian of the Harvard Law School.

Subramanian makes two major arguments. First, Subramanian cites to his own recent scholarly studies to support his view that the *Lynch* form of transaction results, on average, in going private transactions that pay the minority a higher premium in comparison to the pre-announcement market price than do *Siliconix* deals. Second, Subramanian attempts to show that the filing of lawsuits under *Lynch* challenging going private merger proposals by controlling stockholders are a material factor in producing these more favorable results.

I will now explain in summary form Subramanian's arguments and explain why I conclude that the first of his arguments is his strongest, and that his other point is less convincing.

### 1. *Lynch Transactions Versus Siliconix Transactions*

In recent work, Professor Subramanian studied the prices at which going-private transactions occurred since *Siliconix,* breaking them down between merger, or *Lynch,* transactions and tender offer, or *Siliconix,* transactions. Subramanian finds that the final premium paid over the pre-announcement market price was on average higher in *Lynch* deals than *Siliconix* deals, and that the difference was statistically significant.[52] Likewise, he finds that controllers, on average, increase their opening bids more when pursuing a *Lynch* merger than a *Siliconix* tender offer and that the difference is statistically significant.[53] Subramanian, after controlling for other possible factors, concludes that these outcomes differ primarily because of the stronger bargaining hand given to the spe-

cial committee in the *Lynch* context versus the *Siliconix* context. Because the *Lynch* transaction can only proceed with the special committee's approval unless the controller wants to take on the affirmative burden to prove fairness and because a merger transaction presupposes a negotiated price and a tender offer does not, Subramanian believes that minority stockholders do better in *Lynch* deals.

The active bargaining agency of the special committee is, Subramanian concludes, the critically absent feature in *Siliconix* deals. In those deals, the special committee is usually making, at most, a recommendation rather than acting as a necessary approving force and the (disaggregated) minority stockholders are required to make a binary choice between accepting or rejecting the tender offer, without a prior process of negotiation by a bargaining agent on their behalf. Subramanian posits that even when any structural coercion is removed, the stockholders are poorly positioned to extract the controllers' best price. They might protect themselves against unfair prices but are not in a good position to bargain the price up in the same manner as a good special committee in a *Lynch* deal. Likewise, Subramanian finds that special committees in the *Lynch* context are more likely to reach impasses with controllers, thus stopping deals altogether, whereas in the *Siliconix* context, the controller is more likely to succeed in closing a deal.

In his affidavits for this case, Subramanian has performed some additional analyses, to address the objectors' contention that he overstates the different results between *Lynch* and *Siliconix* deals, by inadequately considering the effect of deal size.

---

**52.** Subramanian, *Post–Siliconix Freeze–Outs: Theory & Evidence,* at Table 1 (Working Draft, Jan. 2005).

**53.** *Id.*

To that end, Subramanian directly confronted an affidavit submitted on the objectors' behalf by Professor White. The White affidavit looks to a sample of going private transactions involving more than $100 million, in an attempt to show that the difference in final premia over the pre-announcement market price in *Lynch* deals was only marginally lower than in *Siliconix* deals. By more accurately categorizing White's data, however, Subramanian shows that an examination of going private transactions of over $100 million since *Siliconix* reveals a material difference in final premia between *Lynch* and *Siliconix* deals, with the *Lynch* transactions resulting in a final average premium of 46.1.% and the *Siliconix* transactions resulting in a final average premium of 35.4%. Likewise, premiums increased more on average in the *Lynch* deals than they did in the *Siliconix* deals. These results were not statistically significant because of the small sample size but they depicted a result consistent with Subramanian's examination of all going private transactions since *Siliconix*.

### 2. How Much Does Litigation Contribute To The Favorable Premiums Paid In Lynch Deals And Going–Private Transactions More Generally?

Recognizing, however, that the higher premiums he finds in *Lynch* deals could be solely or almost entirely due to the stronger hand the merger form gives to special committees, Subramanian has performed additional work in order to try to show that the filing of lawsuits like this one is in material part responsible for the higher premiums he finds in *Lynch* deals.

In his affidavits, Subramanian posits that the better results are due to two related factors, which both operate in the same direction. First, in the *Lynch* context, the special committee's refusal to agree to the merger stops the transaction in its tracks, absent the controller's willingness to use its control of the board to force the merger through over the committee's objection and thereby take up the burden of proving fairness. The second, related factor is the plaintiffs' ability to wield the *Lynch* fairness standard, thus giving them a non-dismissible claim that always has settlement value. By contrast, in *Siliconix,* the controller, under *Pure Resources,* may escape fairness review even if the special committee recommends not to tender, and the plaintiffs may face dismissal so long as the complaint cannot plead non-compliance with the conditions outlined in *Pure Resources.* Subramanian infers that the controller can pay a lower price in the *Siliconix* context because the weaker hand of the special committee and plaintiffs, *combined,* will enable controllers to keep more nickels in their pockets and still close deals. For that reason, Subramanian thinks *Lynch,* and the role that it provides to plaintiffs as a watchdog, "polices the worst control shareholder deals, and benefits target company shareholders . . . ."[54]

To convince the court that he is right, Professor Subramanian tries to do something his academic studies did not attempt, which is to show empirically that the efforts of litigating plaintiffs, and not just the work of special committees, are good for minority stockholders in the larger going-private context. To do this analysis, Subramanian culled from the Weiss–White study the going-private transactions which occurred between 1999 and 2001. From this sample, Subramanian concludes

---

54. Subramanian Aff. ¶ 31 (quoting Robert B. Thompson & Randall S. Thomas, *The New Look Of Shareholder Litigation: Acquisition Oriented Class Actions,* 57 Vand. L.Rev. 133, 202 (2004)).

that litigation by stockholder plaintiffs challenging going-private transactions, as opposed simply to the work of special committees addressing those transactions, produces higher premiums for minority stockholders. The way he gets to that conclusion, however, is, to this trial judge's mind, unconvincing.

First, Subramanian divided his going private sample into two categories: transactions with monetary settlements and transactions without monetary settlements. In the first category, he included all settlements in which it was agreed that the plaintiffs' efforts helped increase the price. In the second category, he included all transactions in which there was no litigation, litigation that resulted in a dismissal (seemingly all voluntarily dismissed without prejudice), or litigation that was settled without monetary consideration. Next, comparing these two categories, he finds that the category of cases in which the litigation produced a monetary settlement resulted in a higher average premium, 51.7%, than the other catch-all category, 31.3%. Subramanian believes this is evidence that litigation stipulated to have created a monetary benefit tends to produce a higher premium than in transactions when no such benefit has been stipulated to exist.

Frankly, I am not persuaded that any conclusion of this kind can be drawn from the twenty-five cases he examined. The sample is very small and the record does not reveal what percentage of each category is comprised of *Lynch* versus *Siliconix* deals. Nor does the record reveal any case-specific reasons explaining why certain lawsuits fell within one category or the other. For example, one can imagine a situation when there has been a lengthy non-public bargaining process with a special committee leading to an announced agreement, and the filing of a *Lynch* complaint focused mostly on disclosures but with a non-dismissible claim of financial unfairness. In those situations, the controllers might have been more than willing to disclose more information about the good process involved, and to use that as a basis to get rid of a suit that had, because of the *Lynch* standard, settlement value. Ditto for situations when tardy suits were filed and controllers told the plaintiffs to go litigate, only for the plaintiffs to punk out and dismiss their claims without prejudice.

As a trial judge, putting suits of that kind in a bucket together with cases with no litigation at all skews the analysis from the start. There is absolutely no reason in the record to suspect that the plaintiffs' firms who settled cases with no monetary benefit or who dismissed cases without prejudice were different from those who settled cases with a monetary benefit.[55] Unless there is a basis to suspect that there was some different group of firms bringing the cases in his two categories—and there is none[56]—Subramanian over-

**55.** Interestingly, if one looks at the *four* going private cases Subramanian examines that were dismissed without prejudice, the average premium in his unsuccessful litigation sample actually rises to 40.74%. The average for the entire sample of 31.3% is actually reduced when the *three* cases when plaintiffs achieved a settlement but with no monetary benefit, are included, particularly because one of those cases resulted in a decline in premium of – 4.74%, a decline that suggests a weakened

company was being taken private. Given this and the absence of evidence that different lawyers bring "successful" cases then bring "unsuccessful" ones, the potency of litigation is less than obvious.

**56.** Subramanian relies heavily on a thought-provoking article by Professors Thompson and Thomas of the Vanderbilt Law School. Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation: Acquisition–Oriented Class Actions*, 57 Vand.

estimates how much his small data set says about the potential efficacy of lawsuits attacking going private proposals. And it does even less to show the actual efficacy of litigation to produce good results for stockholders.

Why? Because comparing cases ending with a stipulation that the litigation caused a monetary benefit with cases that did not result in a monetary benefit does not demonstrate the efficacy of litigation, any more than comparing Barry Bonds' at-bats in which he got a hit to those in which he did not would prove Barry Bonds' overall worth as a hitter. We know Barry Bonds is a good hitter precisely because we can see that the results he produces on average from all the instances when he gets to bat are superior to almost anyone else's. By comparing litigation that is stipulated to have created monetary value with other similar litigation that did not result in such value, we do nothing to show what effect litigation has in general. Rather, we show that in those cases in which litigation was stipulated to have influenced a monetary result on a going private, the result was more favorable (in the narrow sense of having resulted in a higher final premium to market) than in cases when the litiga-

L.Rev. 133 (2004). Thompson and Thomas find, as any judge on this court would suspect, that most challenges to going privates and other M & A transactions are initiated by a discrete group of 16–20 law firms, which settle or dismiss most of their cases without much actual litigation activity. *Id.* at 185–189.

Subramanian attempts to show that litigation matters by applying a very small part of the work contained in the Thompson and Thomas article. In that part, Thompson and Thomas compare the results in going privates in which there was a litigation with a monetary settlement to those in which there was litigation but no monetary settlement, a category containing both cases that settled for non-monetary consideration (e.g., additional disclosures) or were dismissed without prejudice by the plaintiffs in exchange for no consideration. In the cases with a monetary settlement, they find, using the medians of their sample, that what they call the "original offer" was a 15% premium over market and that the final premium was 30.04% over market. Meanwhile, in cases where the litigation produced no monetary benefit, the original offer was a 25.5% premium over market and the final premium was the same 25.5% over market. They intuit from this that the plaintiffs' bar helped create value because they sued in cases where the original offer was a lower premium, 15%, and helped produced a higher final premium, 30.04%, than in the other instances when the original and final premium were both 25.5%.

I intuit something very different. The absence of even one deal in the second sample involving a movement upwards from the so-called original offer suggests that the second suits did not attack publicly-announced, negotiable, original proposals; they attacked final deals. That is, they attacked actual transactions that had been negotiated by a special committee, or tender offers that the controllers were seriously presenting as their best and final offers. In these cases, when a controller has already had to complete negotiations with a special committee or launched a tender offer, it cannot provide more consideration without implicitly criticizing the special committee (or itself) and without incurring more out of pocket acquisition costs.

If, as I also intuit, the cases when there was a monetary settlement involved suits attacking a negotiable proposal, it is entirely unsurprising that a material change in price resulted. From the get-go, that was likely and it makes sense for the controller to allow the plaintiffs to share credit with the special committee in exchange for getting the certainty of a litigation settlement.

If, as appears to be true, both sets of cases are filed by the same firms, the division proves little about those firms' efficacy as a monitor or litigation in general for the reasons I articulate above.

And, as Thompson and Thomas point out, the difference in the 30.4% final premium in the cases of "successful" litigation and the 25.5% final premium in the "less or unsuccessful" litigation sample is not statistically significant. This suggests that special committees are pulling the wagon most of the way in these transactions.

tion was not stipulated to have created a monetary result increasing the price of the going private's effectuation. Because both types of cases were actually litigated, doesn't that actually suggest that whatever differences resulted might have had to do primarily with factors unrelated to the litigation itself, such as the specific business circumstances of the target companies involved in the going-private transactions?

Relatedly, if it is the same lawyers who bring both categories of cases, Subramanian lacks a good explanation why the lawyers, like the litigation they bring, are so erratically effective. That is, again, isn't it possible that the category of cases resolved with no "monetary benefit" involved situations when it was implausible not just for the plaintiffs, but for the special committees, to argue for a greater price than was ultimately paid—a case specific variation? Even if that is not the case, if the same plaintiffs' lawyers are willing to set-

tle for less of a premium in certain transactions than they do in others, isn't it also possible that they invariably settle at the same level as the special committee and will not risk pressing a fairness challenge in any instance, even if that means dismissing a case without prejudice? If so, how does this data distinguish between the value of litigation and the value of a special committee? Similarly, if the difference in outcomes relates to the fact that more of the deals in the first category were *Lynch* deals, and more of the deals in the second category were *Siliconix* deals, something I cannot tell from the record, Subramanian is again back to his original problem—the inability to determine whether it is the stronger hand that special committees have in merger transactions than in tender offers that virtually alone drives the results, or whether the greater potential litigation threat in the *Lynch* context is also a materially important contributing factor.[57]

57. Subramanian attempted to push this strained analysis even further, in order to make a case-specific point. To do that, Subramanian took the eighteen transactions that were settled with a stipulation that the litigation had resulted in a monetary benefit. He controlled for transaction size because he recognizes the reality that healthy, large controlled companies (like Cox) with many minority shares afford their minority stockholders with much greater liquidity, and as a consequence their minority shares probably suffer less of a discount than do more thinly traded minority shares in controlled companies. This reality makes the pre-announcement trading price a more meaningful indicator of value in the case of companies like Cox, and, because of their size, means that every percent of premium translates into a large amount of dollars, making it expensive to raise one's bid materially. At the same time, Subramanian claims that large controllers do not necessarily make first bids that, on a percentage basis, offer a lower premium than smaller controllers.

Because the premium included in the Family's Proposal was lower than the average first offer in his sample of monetary benefit cases,

Subramanian claims that there was a "substantial opportunity for plaintiffs' counsel, *in addition to the SNC,* to make a contribution to the final deal price." Subramanian Aff. ¶ 38 (emphasis added). Moreover, Subramanian claims that his eighteen monetary benefit case sample predicted that the Family would eventually raise its opening bid by 6.4%. Because the final price in fact increased 9.8%, Subramanian states that the "increase is higher than what would be predicted based on comparable transactions in which monetary settlements were achieved." Subramanian Aff. ¶ 39. Although Subramanian is careful not to say that this is proof that the plaintiffs' efforts caused this greater than expected bump, he concludes that the result is evidence of what he calls "vigorous bargaining" involving the controller, the special committee, and the plaintiffs, "typical of a well-functioning freeze-out process." Subramanian Aff. ¶ 40. Subramanian optimistically but tentatively concludes that the specific settlement in Cox "fits comfortably within, and in some aspects compares favorably to, the general pattern of freeze-out cases in which counsel achieved a monetary settlement for the plaintiff class." Subramanian Aff. ¶ 41.

Because there are no good examples of situations when a plaintiff's attack on a going private *proposal* has, by actual litigation, added actual value, Subramanian and the plaintiffs are left relying on a more general premise. Reduced to its essence, the message of the plaintiffs, presented through Subramanian and buttressed by an additional affidavit from Professor Geoffrey Miller of New York University, is that the objectors come wielding a solution in search of a problem. The pragmatic way that Delaware is now handling going-private transactions works well when viewed from a broad perspective, they say, and there is no reason to believe it malfunctioned here. Although the way that cases like this proceed is untraditional in the sense that they rarely, if ever, involve any actual prosecution of legal claims, the resulting sausage is savory for all affected constituencies. Even if suits like this are prematurely filed, the overall data tends to support the conclusion that this court's tolerance of "shared credit" settlements in this context has been wise. By promoting the use of special committees as bargaining agents, and permitting suits upon the announcement of a proposed going-private merger, the current *Lynch* transaction/litigation structure must enhance the effectiveness of special committees to some extent. The precise degree to which this litigation helps is difficult, if not impossible, to determine, but so what: the end product is what matters.

### E. The Court's Distillation Of The Expert Input

Where does this leave us? By this point, the reader has probably accurately sensed that I have been dragged into an academic debate of considerable complexity. The lawyers did not ask for an opportunity for the experts to testify and the experts' dueling over minutia in affidavits has been less than clear and helpful. That is not to say that the input they have provided is without decisional utility. It has value if used with appropriate caution. And from it I make the following observations.

First, the record supports the proposition that *Lynch* deals tend to generate higher final premiums than *Siliconix* deals. One would suspect that this would be so for several reasons, including: 1) the greater leverage that the form of transaction gives to special committees; 2) the fact that the governing standard of review always gives the plaintiffs settlement value; 3) the reality that signing up a merger when the votes are locked up results in the greatest certainty for a controller; and 4) signing up a merger with a special committee and a settlement with plaintiffs' law-

---

What is perhaps most striking about this aspect of Subramanian's submission is its failure to point to a legal or valuation argument advanced by the plaintiffs that they might have acted as other than an echo of the Special Committee and its financial advisor, Goldman Sachs. That is because the entire record is devoid of any evidence to support such assertion. As a result, the plaintiffs' experts are left to draw very general conclusions, suggesting and implying, without proving, that this litigation has produced a better outcome for the Cox minority shareholders than the Special Committee would have achieved alone. The argument suffers for the same reason it ails in the more general, theoretical discussion of *Lynch* litigation—the relative contributions of the Special Committee and plaintiffs' counsel have not been, and perhaps cannot be, empirically isolated. The reason why that isolation is not more easily achievable is not one that aids the plaintiffs, however, because the plaintiffs in this kind of case do not actually press legal arguments that, by their force, extract specific concessions from the defendants. Rather, the plaintiffs only make "us too" arguments about valuation that the special committee is almost always far better positioned to advance expertly and with effect.

yers provides not only deal certainty, but a broad release and the most effective discouragement of appraisal claims. One cannot tell, of course, how important each of them is as a factor, but one awkward fact strongly suggests that the threat of bare knuckles litigation over fairness is not as important as the special committee's role as an negotiating force.

That awkward fact is the absence of evidence that "traditional" plaintiffs' lawyers, who attacked going private proposals by controllers, have ever refused to settle once they have received the signal that the defendants have put on the table their best and final offer—i.e., an offer that is acceptable to the special committee. There are examples of when the plaintiffs have settled at a lower price than the special committee demanded,[58] but no examples of when the iron fist of the plaintiffs' bar demanded more than the velvet glove of the special committee. The plaintiffs' bar would say, of course, this is because they did such a good job in each case that the price concessions they helped the special committee extract was of such inarguable fairness that it would been silly to fight on.

Perhaps what can be most charitably said is that the pendency of litigation and the theoretical threat that the plaintiffs will press on provides special committee members with additional clout that they wield to get good results, and that gives lawyers for controllers leverage to get their clients to pay a higher price to en-

sure deal closure and the utmost reduction of litigation risk.[59]

Second, there is much that remains to be explored about the actual price differences between Lynch and Siliconix deals. Many Siliconix deals are quite small and involve very troubled companies. In his article, Subramanian was unable to find a reliable pre-announcement market price to base an analysis for several transactions. Most important, to my mind, is the absence of any data comparing the prices paid in the going private transactions Subramanian examined to fundamental economic value. For example, in many industries, stocks tend to trade at certain multiples to earnings measures such as EBITDA, EBIT, or even earnings per share. Subramanian's analysis would be more convincing had it contained even a partial exploration of data of this kind, to provide a check on his premia-based analysis, by showing that not only are premiums higher in the Lynch deals, the multiple paid to a metric tied to cash flow was also higher. Put another way, if one deal resulted in a 25% premium, and another deal involving a similar company in a similar industry resulted in a 35% premium, but both deals were done at 10 times EBITDA, was the outcome really different? The record contains no data of this kind, none.

Third, litigation under Lynch never seems to involve actual litigation conflict if the lawsuit begins with a suit attacking a negotiable proposal.[60] These cases almost

58. See, e.g., In re Donna Karan Int'l Inc. Shareholders Litigation, C.A. No. 18559, Tr. (Del. Ch. Sept. 10, 2002) (following an initial proposal of $8.50 per share, plaintiffs agreed in principle to settle at $10.50 per share, but the special committee refused to consummate the transaction at that price and ultimately secured a $10.75 per share price).

59. The affidavit filed by John H. Simpson (a former investment banker who represented

buyers and special committees in going private transactions) on the plaintiffs' behalf makes this argument in a bit more aggressive form, stating that the pendency of litigation acts as a cop on the scene, keeping the controller and special committee honest and generating a higher deal price.

60. No exceptional case was identified by the plaintiffs.

invariably settle or are dismissed voluntarily by the plaintiffs. In those instances when there is actual litigation conflict in an "attack" on a going private transaction that has occurred because the complaint actually sought to stop a real transaction—an agreed-upon merger or a tender offer that was actively been pressed.[61] In those situations, it is also much more likely that a plaintiff with a large stake who has hired a non-traditional law firm will mount a challenge. The *Pure Resources* and *Emerging Communications* transactions are good examples of these realities.[62] Indeed, in *Emerging Communications*, the original plaintiffs pressed forward with a settlement after confirmatory discovery that would have resulted in a final price of $10.25 binding those stockholders who did not seek appraisal to the same price negotiated by the special committee.[63] Only after objection by a large holder represented by a very large firm that more usually represents corporate defendants than stockholders was the settlement abandoned. The ultimate result was an award of damages based on a $38.05 per share value, in a detailed opinion by Vice Chancellor (Justice) Jacobs that found glaringly obvious procedural and substantive problems with the special committee process.[64]

Fourth, minority stockholders seem to be doing more than tolerably well under both the *Lynch* and *Siliconix* regimes. Even if premiums to market are lower in *Siliconix* transactions, the premiums paid are large in comparison to the routine, day-to-day trading prices, in which minority and liquidity discounts will be suffered. For that reason, at every settlement, the plaintiffs' lawyers say that they could not risk pushing farther, lest the controller decide not to press on and offer a deal, and the stockholders suffer the fate of continuing as owners of minority shares in a going concern. After all, events that generate liquidity for all minority stockholders at substantial premiums are usually welcomed by stockholders.

Fifth, the experts on both sides have largely ignored another factor. In many going private transactions, the controller is another public company. Many public holders will own shares not only of the

---

**61.** In an earlier hearing in this case, the Family's counsel, Kevin Abrams, noted that in a *Lynch* setting "I can't run the risk ... of running a quasi-appraisal on behalf of a class consisting of hundreds of millions of shares when there is a litigable question over fair value." 1/26/05 Tr. at 29. Subramanian uses this as evidence that litigation of this kind attacking negotiable going private proposals increases premia. Subramanian Supp. Aff. ¶ 24–25. If by that, Subramanian is suggesting there is some de minimis upward price pressure to insure against the small risk plaintiffs will refuse to settle on the same terms as the special committee and actually press a "jump ball" fairness case, I do not disagree. Perhaps *Lynch* leads controllers to offer something more to the special committee to avoid this remote risk. One could more credibly price this risk if the plaintiffs' bar did not always settle for the same, or at times slightly worse, terms than the special committee. It is not clear this upward pressure much exceeds the total economic costs of litigating a *Lynch* case through the summary judgment stage.

**62.** So is another entire fairness case involving the unusual twist of an actual trial. In that case, the plaintiff sued attacking a negotiated transaction before the deal closed, but the trial was forced by defendants, including the special committee, who sought an expedited declaratory judgment that the transaction was fair, preferring to know the answer to that question before closing. *See In re Cysive, Inc. Shareholders Litig.*, 836 A.2d 531 (Del.Ch. 2003).

**63.** *In re Emerging Communications, Inc. Shareholders Litig.*, 2004 WL 1305745 (Del. Ch. June 4, 2004).

**64.** *Id.* at *33–38, 43.

controlled subsidiary, but the controller itself. Although it might be felt important for controllers to pay a fair price in every such transaction, it is arguably not even of benefit to public stockholders as a class for higher prices to be paid simply for the avoidance of litigation costs, rather than because of the real value of the controlled subsidiary. For a diversified investor, transferring money from one pocket to another with leakage to plaintiffs' lawyers and defense counsel is not value-maximizing.

Finally, the very nature of *Lynch* makes it impossible for the court to determine what, if any value, the plaintiffs' lawyers are creating—especially when the plaintiffs sue on the mere announcement of a negotiable proposal. *Lynch* deals started with a publicly announced proposal to a special committee tend to always result in an improvement in price and they tend to always result in a settlement at the same level approved by the special committee. Defendants have no rational incentive to hold out and refuse to settle, as they know they will face a non-dismissible complaint and substantial discovery costs, at a minimum, or, said another way, they have a positive incentive to buy peace in the form of a general release. For their part, plaintiffs' lawyers have a substantial incentive to go along with the final price level a special committee accepts because that will generate a substantial fee at no risk, in strong contrast to the substantial risk that counsel would incur if it spurned settlement, suffered the costs of pressing a case to trial, and hazarded a judicial decision that might find that the special committee obtained a fair price after fair bargaining. The incentives on both sides maximize the likelihood of settlements that result not from any case-specific efforts by the plaintiffs' lawyers, but from the mutually livable outcomes generated when settlements are tied to the financial results achieved by special committees. Everyone gets happy and those few who are not can seek appraisal if they believe strongly enough in their position to run that risk.

Similarly, the incentives that *Lynch* creates make it unlikely that defendants will seek judicial modification of the standard. To do so would require a particular client to pay costs in an effort at law reform by refusing to settle with plaintiffs at the same price as the special committee accepted, and instead litigating a contested motion to dismiss at substantial cost in time and money. To do that would require the defendant to hazard very probable defeat in this court, which would be bound by *Lynch*, and to attempt to convince the trial judge to certify an appeal on that issue to the Supreme Court. Thus, only after a year or so of briefing, would the defendants know whether their effort at law reform would succeed. Meanwhile, the business decision that animated the lawsuit will have been long ago faded from sight of the rear-view window.

For these reasons, the Court of Chancery's ability to determine the value of litigation under *Lynch* is impaired. Because the standard never gives the defendants the usual leverage they have in other transactional contexts—namely, to press a motion to dismiss with credibility when the facts warrant—and because the settlements invariably are the same price level (or sometimes lower) than the special committee ultimately obtained, there is little basis to credit the idea that the defendants settled because the plaintiffs wielded a credible threat of extracting anything more than the economic value of avoided litigation costs. Even in "shared credit" *Revlon* cases, the court has the comfort of knowing that *Revlon* cases have often been dismissed on the pleadings and that the defendants' willingness to settle therefore plausibly represented its judgment that

the litigation had some non-nuisance value.[65] In the type of case I confront today, the judges of this court lack even that small comfort.

## V. Are The Plaintiffs Entitled To An Award Of Attorneys' Fees And In What Amount?

Having completed a lengthy predicate describing the legal context in which this request for attorneys' fees arises, and the arguments of the plaintiffs and the objectors about that context and its relevance, I will now turn to the ultimate resolution of this dispute.

### A. Does Chrysler v. Dann Govern This Case?

I begin by noting what I do not believe my task requires. After careful consideration, I find no basis to revisit on my own initiative my previous decision to approve the settlement in this case as fair and reasonable to the class. This court's role in considering whether to approve a class action settlement is to exercise its own business judgment about the fairness of the settlement, taking into account the relevant factors bearing on the class's best interests. In particular, the court must assess whether the benefits to the class from the proposed settlement exceed the probable benefits the class could achieve by pressing the claims it is releasing.[66] Here, there is no reason to believe that this litigation's contribution to the ultimate $34.75 merger price and the Minority Approval Condition was not sufficient compensation for the release of a potential claim attacking the merger. Nothing in the record suggested that the well-advised Special Committee had failed to bargain aggressively with the Family, that there was any overreaching by the Family, any material non-disclosures or misdisclosures in the merger proxy statement, or that the unaffiliated stockholders were coerced in any manner in voting to approve the merger.

A close examination of our precedent also reveals that there is no requirement that the court deny approval of a settlement if it concludes that the claims to be released could not withstand a motion to dismiss. Rather, the weakness of the claims to be released is factored into the court's analysis of the fairness and reasonableness of the settlement. In *In re Caremark Int'l. Inc. Derivative Litig.*, for example, Chancellor Allen approved a settlement even when the plaintiffs' "claims find no substantial evidentiary support in the record and quite likely were susceptible to a motion to dismiss in all events."[67] The reason for any absence of a meritoriousness argument is obvious: there is no

---

**65.** Probably, for that reason, Professors Thompson and Thomas, as well as Professors Weiss and White, find that *Revlon* cases are more likely to end without a settlement stipulating that the plaintiffs helped to create a monetary benefit. Thompson & Thomas, 57 Vand. L.Rev. at 195–97; Weiss & White, 57 Vand. L.Rev. at 1838–41 (illustrating a high percentage of dismissals without prejudice and of settlements without a monetary component in *Revlon & Unocal* cases).

**66.** E.g., *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del.1989).

**67.** 698 A.2d 959, 970–71. In another notable case, Chancellor Allen approved a settlement after describing with candor his view of the weakness of the plaintiffs' claims. As to a central claim, he even quoted his words from a denial of an application by the plaintiffs to certify his refusal to grant a preliminary injunction for them, comments that stated: "Frankly, I found that the case presented . . . [at the preliminary injunction hearing in this case] was one of the weakest cases legally for the issuance of a preliminary injunction that I have ever encountered in the court." *In re Mobile Communications Corp. of America, Inc., Consol. Litig.*, 1991 WL 1392 at *2 (Del. Ch. Jan. 7, 1991).

just reason to disapprove settlements in cases where the class is being treated fairly simply because it is arguable that the class possesses no viable claims at all. So long as the court discharges its duty to the class by examining the fairness of the settlement, the purpose of the review required by Rule 23 and the Due Process Clause is accomplished.

Here, that review was already undertaken and was premised on the fairness of the class giving up any *Lynch* or other claims it possessed to attack a deal at less than $34.75 per share in exchange for contributing to the Family's decision to offer that price and the Minority Approval Condition. Importantly, the objectors did and do not claim that the settlement should not have been approved by the court. Indeed, they concede that they have no evidence that the class possesses a viable claim that the merger is unfair and they acknowledge that the defendants, having provided expedited discovery to the plaintiffs and having faced pending lawsuits, should not be prevented from resolving those suits in a way that is fair to the class.

What the objectors do say, however, is that Delaware law provides them with a separate club that they can wield in opposing the plaintiffs' request for an award of attorney fees. That club, they say, is the *Chrysler v. Dann*[68] standard.

The *Dann* standard inarguably applies in certain contexts. The quintessential one is when a derivative action is filed making a claim of wrongdoing, when the corporation later takes action consistent with the objectives of the derivative action, the derivative action is therefore mooted, and the plaintiffs' lawyers claim that they should be paid a fee for causing the beneficial action. The difficulty in that context

is determining whether the action that the defendants took really resulted in any proximate way to the pendency of the derivative action.

In those circumstances, *Dann* formulated a method by which courts could distinguish between those situations when the plaintiffs deserved a fee for producing a benefit by their litigation efforts and those when they did not. Part of the thinking behind this method was that courts do not award fees to stockholders for successful efforts at jawboning corporate boards, only for causing benefits by litigation. Perhaps most importantly, the Court was trying to balance competing public policy interests. On the one hand, it was desirable to provide compensation for the attorneys' fees of litigants whose efforts generated a real benefit to the larger mass of stockholders. To that end, when defendants voluntarily took action that satisfied the demand for relief in a lawsuit, it was thought necessary to presume that the defendants took that action in part because of the lawsuit, because only the defendants would know their true motivation. But use of that presumption in isolation threatened to encourage meritless suits, and thus threatened the countervailing policy interest in avoiding burdening stockholders and the public with the costs of complaints filed "for the sole purpose of obtaining counsel fees."[69] To balance these objectives, *Dann* said, our courts required that the plaintiffs seeking a fee award must meet the following test before availing itself of the presumption that its actions caused a fee-generating benefit:

> To justify an allowance of fees the action in which they are sought must have had merit at the time it was filed. It may not be a series of unjustified and unprovable charges of wrongdoing to the

68. 223 A.2d 384 (Del.1966).

69. *Dann*, 223 A.2d at 387.

disadvantage of the corporation. The plaintiff must have some factual basis at least for the making of the charges. If there is none, then the conclusion follows that the action lacked merit and the plaintiff is entitled to no allowance for fees.

* * *

A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.[70]

Assuming *Dann* applies, I agree with the objectors that there is no doubt that the plaintiffs' complaints were not meritorious when filed. Those complaints consist at most of the allegation that the Family's fully negotiable Proposal was made at a point in the market cycle that would enable them to acquire the company at a favorable price. That allegation is not only pled in a cursory manner, it does not, in my view, come close to stating a claim when the offeror is not pressing forward with a tender offer or a cram-down merger in which it is requiring the minority to accept its opening bid in a rapid time frame. Instead, the Family's Proposal was explicitly premised on an acknowledgement that it was negotiable and would be the subject of a bargaining process with an independent special committee of the Cox board. The Special Committee would obviously be expected to retain financial and legal advisors, who would undoubtedly focus the Special Committee on its duty to consider the value of the company as a going concern using estimates of fundamental value such as the discounted cash flow method—methods that have the virtue of focusing on an analysis of the company's expected cash flows and not current market sentiment. And the fact that the plaintiffs later concluded that a price of $34.75 per share—only $2.75 per share more than the original offer—was fair, reveals that their claim that the Family timed its offer in a wrongful way is boilerplate of the kind thrown in virtually every challenge to a "proposed" going private.

Further illustrating the lack of meritoriousness of the complaints in this case, the Family also indisputably noted in the Proposal, and then supported a vote by the Cox board, that no merger would occur without the support of the Special Committee.[71] There are no allegations in the original complaints that the Family was coercing the Special Committee or the stockholders. In fact, the complaints were filed as soon as the Family announced their Proposal publicly. Whatever bull rushing occurred was not by the Family, it was among the plaintiffs who rushed to court to attack a mere, negotiable proposal.

Put simply, when the plaintiffs filed their complaint they were not attacking any completed fiduciary decision. They were attacking a target that, by its very nature, was moving. The only purpose of their complaints was to act as a placeholder for a possible later attack on an actual fiduciary judgment of the Cox board to enter into a formal merger agreement with

---

70. *Id.*

71. The plaintiffs' expert, in one of his recent papers, cites to the Family's announcement of its Proposal as an example of a controller that explicitly conditioned its merger proposal on receipt of "approval of the special committee." Subramanian, *Fixing Freezeouts* at 32 (quoting Cox Communications Press Release (Aug. 2, 2004)).

the Family. The complaints were therefore unripe and without merit.[72]

The plaintiffs also fail the second prong of *Dann*. At the time they filed their complaints, the plaintiffs also lacked "knowledge of provable facts which h[e]ld out some likelihood of ultimate success."[73] In saying that is so, I based that conclusion on my assumption that by success the *Dann* standard refers to some likelihood that the plaintiffs will achieve ultimate success in a court of law by proving that an actionable wrong has been committed. There is no doubt that the plaintiffs' lawyers possessed knowledge that their lawsuits might be successful in the sense that the Family would raise its negotiable bid and they would be able to settle the case and obtain an award of fees. But that is different from having any knowledge of facts that suggested that the negotiations between the Family and the Special Committee would be tainted by wrongdoing of any kind, be it because of bad faith (i.e., disloyal) or slothful (i.e., careless) behavior. The plaintiffs possessed no such facts. And as it turned out, the Special Committee hired well-known financial and legal advisors and bargained the Family into paying a price that the plaintiffs found to be favorable.[74]

Thus, to my mind, the key question is not whether the plaintiffs' claims were meritorious when filed—they were not—but whether the *Dann* standard applies to this dispute. In dictum in its later *Allied Artists Pictures Corp. v. Baron* decision, the Supreme Court shed light on its understanding of the purpose of the rule articulated in *Dann*:

> [*Dann*, its predecessors, and its progeny] have insisted that a settled or mooted action, in order to form the basis for an award to counsel, must have been meritorious when filed. At least one commentator has suggested that as long

the premise that had the Family and special committee hypothetically reached a deal at $33.25 per share, for example, the plaintiffs, under *Lynch*, could have pled a non-dismissible claim. Because the very standard of *Lynch* created that ability, I evaluated the value of the *possible Lynch* claim the class possessed attacking a transaction at a somewhat lower level to the value created by the Family's agreement, in part to resolve the potential *Lynch* claim attacking a transaction, to pay $34.75 per share.

The plaintiffs originally took the position in their fee brief that the settlement could only be approved if the court found that the claims met the meritoriousness standard of *Dann*, which is discussed in detail later. They and the defendants have abandoned that stark position.

In any event, given the fiduciary role this court plays in the settlement context, I do not feel bound to rotely honor my prior dictum, which read literally, is, I now conclude after full briefing, inaccurate to the extent that it implied that the plaintiffs' complaints had satisfied the *Dann* standard. They did not file meritorious complaints.

---

**72.** In *Belanger v. Fab Indus., Inc.*, 2004 WL 3030517 (Del.Ch. Dec.29, 2004), this court held that a complaint attacking a proposed management buy out was not meritorious when the proposal was never accepted by the special committee to which it was addressed. The court therefore rejected an application for fees based on the CEO's withdrawal of his MBO proposal. *Id.* at *1–*2; *see also Stroud v. Milliken Enterprises, Inc.*, 552 A.2d 476, 481 (Del.1989) (refusing to opine on a proposed notice to stockholders and noting that important corporate law decisions should be decided when the "dispute between the parties [is] close to a 'concrete and final form.' ") (citations omitted).

**73.** *Dann*, 223 A.2d at 387.

**74.** As of the hearing on the approval of the settlement, the plaintiffs and the objectors had not completed briefing on the objection to the fee. At the hearing, I made what I now believe to have been imprecise and unnecessary statements, which could be read as indicating that the plaintiffs' claims were meritorious when filed. I did so not based on the claims that the plaintiffs actually filed, but on

as there can be shown a causal connection between the suit and the benefit, e.g., the defendant took it seriously enough to want to settle or take mooting action, it should not matter whether the suit had legal merit. Note, *Recovery of Attorneys' Fees On Mooted Claims,* 63 Cornell L.Rev. 880, 887 (1978). But this Court has been concerned with discouraging baseless litigation (*see Chrysler Corporation v. Dann,* ... 223 A.2d at 386–387) and has adhered to the merit requirement.[75]

The reason that the statement is dictum is that *Allied Artists* involved the quintessential situation when the *Dann* rule applies— when a plaintiff seeks a fee based on the argument that the corporation took beneficial action consistent with the plaintiffs' request for relief that mooted the action.

A different question raised by this case, however, is whether *Dann* has any application at all to an application for attorneys' fees that is objected to, not by objectors who will be economically injured by the payment of the fee, but by objectors who, as a general policy matter, find it offensive that the plaintiffs' counsel are being rewarded for bringing a meritless suit. In every previous case under *Dann,* the meritoriousness inquiry has arisen because an objection has been raised by a party that would suffer an economic injury if the fee was granted—such as the corporation in a derivative suit when the corporation is to be the source of the fee or class members when the fee is to be paid out of the common fund. The reason for this is that the core purpose of the *Dann* standard resides in its role as a gatekeeper in situations when it is uncertain whether the litigation itself caused the creation of a corporate benefit or a common fund. By requiring the plaintiffs, as a pre-requisite to a fee award, to show that their lawsuit was meritorious when filed, the court can then fairly put the burden on the defendants to show that their actions to moot the suit were not caused by the lawsuit. The prior cases, therefore, all arise in the context of situations when the party objecting to the fee—most often, the corporation itself—denies that the plaintiffs' litigation efforts benefited them at all and that it would therefore be inequitable for them to be forced to contribute to a fee.

Here, the objectors themselves make no contention that the Family would have paid $34.75 per share *plus* the amount of the fees sought by plaintiffs in the absence of this suit. Rather, they contend that the Family would likely have paid exactly $34.75 regardless of whether the suit was filed, no more and no less. That is, they view the litigation as a non-event to them, except insofar as it is part and parcel of what they see as a pattern of costly, frivolous suits that do nothing but generate legal fees.

Even though that is the case, the objectors claim that they are entitled to have their objection to the fee sustained unless the plaintiffs can show that the complaint was meritorious when filed. They say that the larger public policy interest served by *Dann* is what is paramount, not the technical fact that the class is not bearing the fee directly.

In this regard, the objectors point out that this court has never rubber-stamped fees simply because defendants agree to pay them, even in cases when no objection has been made to either the settlement or the fee requested. The reason for that is simple: our courts recognize that the representative litigation process can only operate with integrity if it is difficult to reap windfall profits by filing frivolous or premature suits and if there are disincentives

---

**75.** *Allied Artists Pictures Corp. v. Baron,* 413    A.2d 876, 879 (Del.1980).

for collusive settlements. The requirement that any applicant for a fee have filed a meritorious claim serves just such an integrity-enhancing purpose. The objectors therefore say that they are entitled to block the award of any fee at all to the plaintiffs, because the objectors have proven that the plaintiffs did not file meritorious claims.

There is undeniable appeal to the objectors' argument. But, in the end, I think it goes too far and seeks to extend a practical doctrine designed to govern a very different context in a way that is unnecessary to ensure the integrity of the representative litigation process and that is likely to generate excessive litigation costs. Corporate and commercial litigation comes in all varieties and the law needs a degree of plasticity to address that diversity sensibly. Under the objectors' view, *Dann* requires the court to definitely resolve the pleading-stage viability of claims even in a situation when the paying party does not object to a fee and when there is no contention by the objector that they would suffer injury from a fee award. To embrace this argument and to put it in operation would be wasteful and do little to promote the integrity of the process. One can easily imagine situations when it is highly debatable whether a complaint would survive a motion to dismiss and the uncertainty of that proposition is what drove a favorable settlement for the class. To have an objector come forward and concede that the settlement was favorable but contest the fee under *Dann* would be inequitable and serve no proper purpose. And think of what it would require of the court—replicating the intensive rigor of a formal Rule 12(b)(6) opinion—but in a situation when the party asking for that effort has nothing at stake.

This is not to go to the other extreme and to say that the objectors have no standing to comment on the requested fee at all. They, of course, do. Stockholders have a cognizable interest in the integrity of the representative litigation process and in ensuring that it functions in a manner that generates benefits for its intended beneficiaries, and not windfalls to attorneys.

This interest, however, is protected in two other ways that are sufficient. Most important, of course, is the requirement that the court examine the substantive fairness of a proposed settlement itself. This judicial duty polices misconduct at the expense of class members, although it is not without its imperfections. The other related procedure is the court's consideration of what fee to award. In Delaware, the most important factor that drives the court's award of fees is the court's assessment of the benefit that the plaintiffs have created.[76] In effect, this second protection accomplishes a similar type of protection that objectors seek through *Dann*, but with improved nuance.

As the objectors point out, this court has never yielded to plaintiffs and defendants the right to set the level of fees that are awarded in representative actions. Even when defendants agree to pay the requested fee fully, the settlement benefits to the class are concededly adequate, and there has been no objection, this court has often reduced the requested fee to a smaller number. In so doing, it has attempted to make sure that it only awards fees that genuinely reflect a fair award for the benefit created, and to differentiate between those situations when the plaintiffs have taken genuine risk and fought valiantly, and when the plaintiffs faced little risk or proceeded timorously.

76. *E.g., Sanders v. Wang*, 2001 WL 599901, at *2 (Del. May 29, 2001).

Therefore, rather than hold that the rigid *Dann* standard applies to an objection to a fee made by a party who does not object to the fairness of the settlement itself, will not be forced to bear any of the fee, and who does not contend that the defendants reduced any benefit they would have otherwise provided to the class by the amount of the fee they agreed to pay, I conclude that the views of an objector of that kind should be considered by the court in applying the traditional factors that govern the size of the fee that should be awarded to the plaintiffs when they have been party to a settlement that the court found to be fair and reasonable to the class.

Those aptly named *"Sugarland"* factors include: 1) the benefits achieved in the action; 2) the efforts of counsel and the time spent in connection with the case; 3) the contingent nature of the case; 4) the difficulty of the litigation; and 5) the standing and ability of counsel.[77] It is in the application of these factors that I believe the objectors' arguments have real bite.

### B. *What Fee Is Appropriate Under Sugarland?*

The plaintiffs naturally tout the size of the supposed benefit they helped create—some $675 million as measured by the simple difference between the Family's negotiable $32 offer and the final $34.75 merger price—and say that the fee they request—$4.95 million—is less than 1% of that amount. Moreover, they note that the fee was vigorously negotiated with the Family after the settlement terms were finalized. And, of course, they say, this is risky, high-stakes contingent fee litigation for which they could have received nothing. Having put in a collective total of over 2300 hours work and paid a financial advisor $200,000 to help them get a good deal for the stockholders, the plaintiffs say that their request for a fee equivalent to an hourly rate of $2009 per hour is very reasonable, if not conservative. To buttress that contention, they note that senior partners and associates in New York firms that work on the defense side of corporate transactions regularly receive up to $800 and $500 per hour respectively for non-contingent work, and that the award of sizable premium to plaintiffs in a risky contingency case that produced a huge benefit is more than justifiable, given the other cases they take on without any compensation at all.

The objectors, however, have the better of the argument under *Sugarland.* I begin with the supposed benefit. The size of the supposed benefit is largely a product of the size of the transaction itself. Furthermore, I have absolutely no reason to believe that the plaintiffs are responsible for more than a very small amount of the difference between the original offer and the negotiated price. There is nothing in the record that shows that the plaintiffs had any novel legal arguments up their sleeve. Rather, they, at most, hired an experienced financial advisor, Smithline, to help them make arguments that replicated the arguments already being made by the special committee and its financial advisor, Goldman Sachs, a firm that is fairly regarded, with no disrespect to the plaintiff's financial advisor, as wielding more credibility and clout than he. The plaintiffs' negotiations with the Family prove nothing more than that the defendants knew that there was a value, per *Lynch,* in resolving the suit, and that they needed to negotiate to accomplish that. At most, the plaintiffs were a stand-by monitor of a Special Committee negotiation process that could have

---

**77.** *Sugarland Indus., Inc. v. Thomas,* 420 A.2d     142, 147–50 (Del.1980).

gone wrong, but apparently never did. Unlike the plaintiffs and their expert, I conclude that if there was any higher-than-typical increase in the final merger terms here, as measured from the original Proposal, then that increase was almost entirely due to the Special Committee's diligent efforts and not to any litigation threat posed by the plaintiffs.

As far as risk is concerned, I can discern no appreciable risk taken by the plaintiffs' lawyers. The plaintiffs knew when they filed suit that the Family would almost certainly have to raise its bid in order to satisfy the special committee. They knew that the increase from the Proposal was likely to be material. If ever there was a low risk case, it was this one. Cox was a valuable company with a large number of outstanding public shares, therefore small per share price moves would be worth tens of millions of dollars. Given the *Lynch* standard, the plaintiffs also knew that the defendants would have an incentive to settle because the defendants would have no ability under *Lynch*, to get an amended complaint alleging financial unfairness dismissed if the plaintiffs chose to sue on the final negotiated deal. In sum, this case involved at most a trifling risk.

What would have been risky, I agree, is if the plaintiffs would have refused to settle at $34.75 per share and sued under *Lynch*. Given the special committee process, the Minority Approval Condition, and other factors, the plaintiffs candidly admit that they would have faced an uphill challenge. But, given the absence of any showing that the traditional plaintiffs' bar has ever been willing to press onward with a *Lynch* case brought in response to a negotiable proposal in the face of a special committee's later agreement to a merger,

the plaintiffs cannot claim that this theoretical risk of ultimate loss of a ripe *Lynch* case justifies giving them a risk premium here. To do so simply rewards attorneys for filing premature suits against negotiable proposals.

Likewise, as the plaintiffs point out, the hours put in by the plaintiffs' attorneys seem excessive given the work that they actually did. The original complaints were hastily drafted throw-aways, except for the complaint filed by the Prickett firm. Work of the quality reflected in the complaints would not command, from a paying client, a $500 an hour fee, to put it mildly. Furthermore, many of the hours in the case were spent on an organizational feud among the plaintiffs' firms for the coveted position of lead counsel and far too many were put in by senior partners. And, aside from the dashed-off complaints and confirmatory discovery, there was little actual litigation work done, aside from the settlement negotiations themselves. In this regard, it is also worth noting that I lack any reliable lodestar because the hourly rates of the attorneys who worked on the case were not submitted and because even if they were, most of the firms have traditionally been unable to demonstrate that they have clients who ever pay their posted rates on a non-contingent basis.

Put simply, because this case is characteristic of *Lynch* cases involving suits on mere proposals, there was not much work to be done, except in negotiating and later conducting confirmatory discovery of a settlement. There is no special complexity to the case; indeed, it is entirely characteristic of prior going private cases attacking negotiable proposals.[78]

---

**78.** In fact, in the same week I had arguments on this objection, I held a hearing in another smaller (in terms of deal size) case of this same type in which the Abbey Gardy firm was lead counsel. The pattern of conduct among the players was functionally identical in all

For all these reasons, I conclude that the fee sought is well in excess of what can reasonably be justified. In suits of this kind that involve a suit on a negotiable proposal and a settlement of the case at the same price and terms accepted by a special committee, I believe that there is no justification in *typical* circumstances to award a risk premium at all.[79] That is certainly true here when it was certain from the get-go that the price would increase and when many of the hours were incurred after the MOU was signed.

And, given that the hours worked on the matter are excessive in relation to what was usefully done, involved an inefficient allocation between partners and associates, and involved work done on poorly crafted complaints and organizational infighting, I do not credit the full amount of hours submitted as being reasonable.

That said, I credit, as the objectors do not, some countervailing factors. Although I have no reason to believe that the plaintiffs' efforts were responsible for the bulk of the increase in price, I do suspect that the desire of the defendants to get rid of the litigation had some useful role in the ultimate price attained. Given the size of the transaction, the extent of the plaintiffs' contribution in pennies per share did not have to be large to have generated a sizable benefit.

I also credit that the defendants negotiated the fee at a time when they had an interest in minimizing it. Unlike the objectors, I do not believe that counsel for the Family was constrained in bargaining hard by their desire to be able to settle

future cases for different clients. Of course, counsel for the Family recognized the practical reality that there was a risk of a large fee award and that it would be silly negotiating strategy to insist on paying a trifling fee. That does not mean that counsel for the Family, having a duty to represent their client's interest faithfully, did not try to keep as low they could achieve, factoring in the risk that the court might award an even higher fee if no agreement was reached.

For those reasons—the size of the benefit and the negotiation of the fee by defendants—I have awarded a fee larger than I otherwise would have. I do so by awarding a total award of fees and expenses of $1.275 million. That could be translated into an award of $500 per hour for 2000 hours worked, plus the full payment of expenses. Given the factors outlined above, that is a more than generous award.

## VI. *A Coda On The Jurisprudential Elephant In The Corner*

Before concluding, I feel obliged to add a coda. The present case illustrates, in my view, the need to adjust our common law of corporations to take appropriate account of the positive and negative consequences flowing from the standard of review governing going private mergers.

*Lynch* is a well-motivated decision that belies any contention that Delaware law blindly favors management. The incentive it creates for the use of well-functioning special committees is useful and has benefited minority stockholders. But its failure to provide any additional incentive for the use of Minority Approval Conditions—

respects. *In re Sportsline.com, Inc. Shareholders Litig.*, C.A. No. 538–N, Tr. (Del. Ch. May 11, 2005).

79. One should be careful about saying "never." There could be a situation when the plaintiffs actually achieve through articulation

of a novel legal argument involving, for example, deal structure under a particular charter or the revelation of a crucial, undisclosed fact (e.g., a price increase that indisputably results solely from their actions as plaintiffs pressing legal arguments).

except as a settlement add-on—is less useful.[80] Even more, by creating a standard of review that makes it impossible for a controlling stockholder to structure a going private merger in any fashion that will enable a successful attack on a complaint that alleges financial unfairness on a notice pleading basis, *Lynch* has generated perverse incentives for both defense and plaintiffs' counsel that cast doubt on the integrity of the representative litigation process.

In the plaintiffs' submissions, much has been made of the notion that even if lawsuits filed on mere proposals are not ripe and have no merit, having the presence of plaintiffs' lawyers around during the negotiation process has led to good results and that the law should therefore tolerate the continuation of this phenomenon. In *Bird v. Lida, Inc.*, Chancellor Allen noted that arguments of this kind have not and should never be deemed sufficient by courts of law.[81] The judicial process should be invoked when a party has a genuine claim of injury. Particularly in the representative litigation context, where there are deep concerns about the agency costs imposed by plaintiffs' attorneys, our

judiciary must be vigilant to make sure that the incentives we create promote integrity and that we do not, by judicial doctrine, generate the need for defendants to settle simply because they have no viable alternative, even when they have done nothing wrong. This vigilance is appropriate not because the representative litigation process is not important to our corporate law's ability to protect stockholders against fiduciary wrongdoing, but precisely because it is so important. That process should not be one that we permit to be seen as lacking in integrity and therefore vulnerable to elimination.

In this corner of our law, a relatively modest alteration of *Lynch* would do much to ensure this type of integrity, while continuing to provide important, and I would argue, *enhanced*, protections for minority stockholders. That alteration would permit the invocation of the business judgment rule for a going private merger that involved procedural protections that mirrored what is contemplated in an arms-length merger under § 251—independent, disinterested director *and* stockholder approval.[82] Put simply, if a controller proposed a merger, subject from inception [83] to negotiation and approval of the merger

---

80. Subramanian, *Fixing Freezeouts*, at 46, 48 (finding that *Lynch* "falls short on the second-step of the arms-length process, approval from disinterested stockholders" because "existing doctrine" provides no incentive for use of a Minority Approval Condition and therefore makes "such conditions rare in practice").

81. 681 A.2d 399, 407 (Del.Ch.1996).

82. A plausible argument can be made, based on prior experience, that the use of an independent special committee to negotiate a going private merger, even without a Minority Approval Condition, ought to invoke the business judgment rule. It is theoretically possible for such a committee, if well-motivated and expert, to drive a better deal for stockholders by trading off the closing certainty of

a Minority Approval Condition in exchange for a higher price from the controller. Because of the sharp conflict that going-private transactions involve and the informational advantages that controllers often possess, however, the possibility that special committees might occasionally drive better deals if they can trade closing certainty (i.e., because the controller can use its own votes to accomplish the merger) for price seems to me to be outweighed by the general utility of ensuring that controllers and special committees both know that the transactions they agree upon will be subject to approval by the disinterested minority (or entire fairness review).

83. By this rule, a controller would not be able to throw in a Minority Approval Condition as alternative consideration to more cash or stock.

by an independent special committee *and* a Minority Approval Condition, the business judgment rule should presumptively apply. In that situation, the controller and the directors of the affected company should be able to obtain dismissal of a complaint unless: 1) the plaintiffs plead particularized facts that the special committee was not independent or was not effective because of its own breach of fiduciary duty or wrongdoing by the controller (e.g., fraud on the committee); or 2) the approval of the minority stockholders was tainted by misdisclosure, or actual or structural coercion.[84]

This alteration would promote the universal use of a transactional structure that is very favorable to minority stockholders—one that deploys an active, disinterested negotiating agent to bargain for the minority coupled with an opportunity for the minority to freely decide whether to accept or reject their agent's work product. Indeed, the plaintiffs' own expert, Professor Subramanian, supports reform of precisely this kind.[85] And *Lynch* in its current form could be retained to govern any merger in which the controller refuses to use both of these techniques from the inception of the process, allowing for the controller to proceed, get appropriate burden-shifting credit for use of special committee or a Minority Approval Condition, but remain subject to the entire fairness standard.[86]

Importantly, this revised standard would not diminish the integrity-enforcing potential of litigation in any material way, in my view. Plaintiffs who believed that a special committee breached its fiduciary duties in agreeing to a merger would continue to have the practical ability to press a claim; they would just have to allege particularized facts demonstrating a breach of fiduciary duty. When they file a complaint attempting to do just that, and a case thereafter settles for an increase in the negotiated merger price, the court will have real confidence that the lawsuit had remedial value because the defendants' decision to settle represented their assessment that the plaintiffs' complaint had a meaningful chance of withstanding a motion to dismiss.

This standard would also encourage the filing of claims only by plaintiffs and plain-

---

**84.** The revision will only eliminate nuisance suits if it permits an attack on the pleadings by the defendants. Any standard that enables plaintiffs to get discovery simply by alleging financial unfairness by notice pleading will present the same problems as *Lynch*. *See In re Cysive, Inc. Shareholders Litig.*, 836 A.2d 531, 548–49 (Del.Ch.2003).

**85.** Subramanian, *Fixing Freezeouts* at 48 (arguing for business judgment rule treatment for controlling stockholder mergers when these conditions exist). Reform of this kind would also be consistent with the views expressed in *Pure Resources*, 808 A.2d at 444 n. 43, and *Cysive*, 836 A.2d 531 (Del.Ch.2003), as well as by Professors Gilson and Gordon in their excellent article. Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Stockholders*, 152 U. Pa. L.Rev. 785 (2003).

**86.** In his scholarly work, Subramanian suggests that the current *Lynch* rule should be retained when a controller uses either an independent special committee or an Minority Approval Condition; through this means, controllers still have options to proceed if a special committee refuses to do a deal or if it bypasses a Minority Approval Condition, but would then face the prospect of an entire fairness case. *E.g.*, Subramanian, *Fixing Freezeouts* at 57–58. He takes this position because his data suggests that too strong a hand for a special committee is not always an unadulterated good for minority stockholders. In several situations when special committees refused to accede to a merger at a premium, Subramanian finds that the minority stockholders ended up doing worse. On the other hand, in a similar number of such situations, the special committee's refusal worked out well for the minority. Subramanian, *Fixing Freezeouts*, at 34–35.

tiffs' lawyers who genuinely believed that a wrong had been committed. The chance to free ride on the expected increase in the controller's original proposal would be eliminated and therefore litigation would only be filed by those who believed that they possessed legal claims with value.[87]

Importantly, a revision along these lines would leave in place another remedial option that is viable for stockholders who believe that the ultimate price paid in a negotiated merger is unfair—appraisal. Appraisal permits a stockholder to receive a fair value determination regardless of the procedural fairness leading to a merger. Particularly for institutional investors with large stakes, appraisal can be a potent remedy, as certain recent cases have shown.[88]

Therefore, this revision would have much to offer minority stockholders. Mi-

nority stockholders would continue to receive the benefits of the mechanism that most commentators believe is responsible for the bulk of the premiums paid in the going privates, the negotiating power of special committees, but backed up by an incentive system that would give them, through an up-front Minority Approval Condition, the right to turn down their negotiating agent's work.[89] At the same time, they would retain viable litigation options that would also operate to deter overreaching by controllers.

Of course, a revision in *Lynch* alone is arguably not complete. The plaintiffs have presented a cogent argument that the negotiating leverage wielded by special committees in mergers with controlling stockholders results in better outcomes for stockholders than does the ability of stockholders to reject a structurally non-coercive tender offer made by a controlling

---

87. Weiss and White argue, with persuasive power, that stockholders with a very large stake will tend to litigate more sparingly but also more aggressively in those cases when they believe their economic interests have been injured. Weiss & White, 57 Vand. L.Rev. at 1841–45. Such stockholders have little motivation to attack mere proposals, which is why most suits attacking such proposals are brought by repeat plaintiffs with nominal stakes. Even the holdings of Abbey Gardy's client, M & R, do not reflect a very large stake, certainly not of the magnitude involved in *Emerging Communications*, a vigorously prosecuted attack on an actual merger agreement.

88. Appraisal, of course, may not be available in a going-private transaction in which widely traded stock is the acquisition currency. Moreover, I do not ignore the realities that make appraisal an inefficient remedy for small holders, or the risk that appraisal petitioners must take (of getting less than the deal price). *See Andra v. Blount*, 772 A.2d 183 (Del.Ch.2000) (detailing some of these realities). But with increasing institutional activism, smaller holders may have increased opportunities to share in the benefits of an

appraisal action led by a bigger holder. *See, e.g., In re Emerging Communications, Inc. Shareholders Litig.*, 2004 WL 1305745 (Del. Ch. June 4, 2004) ($38.05 per share award compared to $10.25 per share deal price); *see also Prescott Group Small Cap, L.P. v. The Coleman Company, Inc.*, 2004 WL 2059515 (Del.Ch. Sept. 8, 2004) (granting $31.94 in appraisal to a large holder who had opted out when traditional plaintiffs settled for $11.00 per share). Moreover, the risk incurred in an appraisal is arguably at least partially mitigated by the possibility of receiving a higher price, even if the fiduciaries involved in the merger acted in the utmost good faith and the deal price was in the range of fairness, if the deal price was not as high as the fair value determined by the court.

89. Subramanian, *Fixing Freezeouts*, at 47 (finding that Minority Approval Conditions serve "two critical purposes in freezeouts," namely, 1) providing a minority stockholder check on the special committee's work as their agents; and 2) providing an "implicit market check" in the form of the possibility that a deal jumper will offer to buy the entire minority stake for a higher premium than the controller).

stockholder. The jarring doctrinal inconsistency between the equitable principles of fiduciary duty that apply to *Lynch* and *Siliconix* deals has been noted by this court before in *Pure Resources* and *Cysive*.[90] It was thought preferable in *Pure Resources* to keep the strands separate until there is an alteration in *Lynch,* lest the less than confidence inspiring pattern of "*Lynch* litigation" replicate itself across-the-board in all going private transactions, thereby deterring the procession of offers that provide valuable liquidity to minority stockholders and efficiency for the economy in general.[91]

A principled reconciliation of the two lines of authority could center on much the same solution articulated above, as Professors Gilson and Gordon have suggested in an important scholarly article.[92] In the case of a tender offer by a controlling stockholder, the controlling stockholder could be relieved of the burden of proving entire fairness if: 1) the tender offer was recommended by an independent special committee; 2) the tender offer was structurally non-coercive in the manner articulated by *Pure Resources*; and 3) there was a disclosure of all material facts. In that case, the transaction should be immune from challenge in a breach of fiduciary duty action unless the plaintiffs pled particularized facts from which it could be inferred that the special committee's recommendation was tainted by a breach of

fiduciary duty or that there was a failure in disclosure. That is, an alteration on the *Lynch* line could be accompanied by a strengthening of equitable review in the *Siliconix* line. But in both cases, there would remain a strong incentive for controllers to afford stockholders the procedural protection *of both* a special committee with real clout and of non-coerced, fully informed approval by the minority stockholders.[93]

As important, this incentive would enable transactional planners to know that they can structure transactions in a way that affords them the opportunity to obtain a dismissal on the complaint. In this way, the alteration brings this area of our law into harmony with the rest of Delaware corporate law that gives substantial deference to decisions made by disinterested, independent directors and approved by disinterested, non-coerced stockholders. That deference is consistent with the central notion of our law, which respects business judgments made by impartial directors and approved by unconflicted stockholders. This deference is illustrated by the landmark decision in *Aronson v. Lewis,*[94] which presumes that independent directors can impartially decide whether to cause the company to sue a controlling stockholder.

By comparison to *Aronson,* it seems a modest move to give presumptive deference to a tender offer or merger that has

---

**90.** *See Pure Resources,* 808 A.2d at 442 ("I admit being troubled by the imbalance in Delaware law exposed by the *Solomon/Lynch* line of cases."); *Cysive,* 836 A.2d at 547 (referring to the disparity in treatment as "passing strange").

**91.** *Cf.* Subramanian, *Fixing Freezeouts,* at 23 (expressing view that *Lynch* deters some value-creating transactions that would benefit minority stockholders and society).

**92.** Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Stockholders,* 152 U. Pa. L.Rev. 785, 827–28 (2003).

**93.** This reconciliation is consistent not only with the proposals advocated by Professors Gilson & Gordon, but also by the plaintiffs' expert, Professor Subramanian. *See* Gilson & Gordon, 152 U. Pa. L.Rev. at 839–40 (urging convergence along these lines); Subramanian, *Fixing Freezeouts,* at 58 (same).

**94.** 473 A.2d 805 (Del.1984).

not only the approval of a special committee of independent directors but also the support of the disinterested stockholders themselves. And, by doing so, our common law would encourage the consistent use of the transaction structure that best protects minority stockholders while simultaneously discouraging the filing of premature lawsuits of dubious integrity and social utility.

By now, experience has proven that special committees and independent board majorities are willing to say no to controllers. Experience has also shown that disinterested stockholders, given a non-coercive choice, will reject low ball tender offers by controllers.[95] The sociological inference of implicit coercion originated in *Citron* and accepted in *Lynch* is not one that we accept in the more difficult demand refusal setting. If both the independent directors and the disinterested stockholders are given the ability to say no and do not, ought we not presumptively assume that the transaction was fair? This is corporate law, after all, a species of commercial law involving stockholders (increasingly of the institutional investor variety) who would be well-positioned to protect themselves through diversification, the voting power that this new incentive system would invest in them, and through the potent litigation weapons that would remain in their arsenal. It is also important not to forget that they would remain shielded by the strong role that our law gives to independent directors.

The difficulty, of course, is that our courts are not presented with an opportunity to evolve the common law in this area because the incentives *Lynch* creates make a frontal challenge to the existing regime irrational for defendants. Perhaps in some modest way, the objectors have

forced us to move closer to a re-examination of *Lynch*. Judicial recognition that *Lynch* suits attacking proposals to negotiate a going private merger are not meritorious when filed may embolden some controller and some special committee to ignore the filing of a prematurely filed suit, and to concentrate on negotiating a mutually acceptable and fair merger. In that scenario, if the plaintiffs then claim "credit" under *Dann* for the expected increase in price, they will lose if the defendants object.

The risk that the defendants would still face would be the possibility that the plaintiffs would then file a *Lynch* suit attacking the negotiated merger's fairness that would be, under current law, not susceptible to a motion to dismiss. But in that context, if the plaintiffs then settle for a trifle, the court will know the value the defendants really placed on the threat of litigation, and better understand if the settlement is really just a payment to avoid the costs of discovery and motion practice. By contrast, if the defendants settle for a large amount, then the court could rationally conclude that the plaintiffs had raised a substantial question as to whether the merger, despite the facial fairness of the process, was in fact fair and untainted by fiduciary breaches.

And by recognizing that complaints attacking negotiable proposals are not meritorious and do not give rise to a presumptive claim to a fee, there is a somewhat greater possibility that some group of defendants might challenge the viability of a complaint attacking a merger negotiated by a special committee and subject to an effective Minority Approval Condition from the get-go, irrespective of *Lynch*, and ask this court to certify the standard of review question to the Supreme Court for

---

**95.** In *Siliconix* itself, the controller's offer did    not succeed.

re-examination. Easing this risk is the jurisprudential reality surfaced earlier. In *Lynch,* the argument that both special committee and an effective majority of the Minority Approval Condition should, as a tandem, justify invocation of the business judgment rule, was never presented. Therefore, it is arguable that the Supreme Court has never been asked to address the precise question that would be posed if a controller, from the inception of a transaction, made clear that its merger proposal was conditioned upon the use of both of these procedural protections, so as to most closely replicate the process by which an arms-length merger is approved under § 251.

But in any of the scenarios just outlined, we will have greater confidence that any litigation that is filed is motivated by a genuine belief that corporate fiduciaries have breached their obligations, and that any resulting settlements reflect the defendants' assessment that the plaintiffs have pled substantial claims rather than makeweight claims that, simply because of doctrinal law, cannot be dismissed until after full discovery and, at best, full briefing of a motion for summary judgment.

## VII. *Conclusion*

For the foregoing reasons, I grant an award of fees and expenses to the plaintiffs of $1.275 million to be paid by the Family's holding corporation in accordance with the stipulation of settlement. This is the final order in the case. IT IS SO ORDERED.